Ernest V. Berry v. Commissioner. Ernest V. Berry, Inc. v. Commissioner.
Berry v. Commissioner
Docket Nos. 93271, 93272.
United States Tax Court
T.C. Memo 1964-181; 1964 Tax Ct. Memo LEXIS 157; 23 T.C.M. (CCH) 1077; T.C.M. (RIA) 64181; June 30, 1964
*157 Respondent properly disallowed deductions for alleged rental payments since, under the facts, such payments were not intended as rent, but constituted nondeductible items. Gerard C. Tracy, for the petitioners. J. Earl Gardner, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined the following deficiencies in income tax: Deficiency
Deficiency
Taxable Year
in Docket
in Docket
Ending
#93271
#93272
Dec. 31, 1953
$24,305.68
Dec. 31, 1954
60,643.06
Dec. 31, 1955
23,213.28
$ 5,925.27
Dec. 31, 1956
17,738.05
15,913.37
Petitioner in Docket No. 93271 asserts overpayments of income tax, for which timely claims for refund have been filed, in the *158 following amounts: Taxable Year
Overpayment
Ending
Asserted
Dec. 31, 1953
$1,660.31
Dec. 31, 1954
5,570.00
Dec. 31, 1955
5,339.29
Dec. 31, 1956
1,572.18
The parties have reached agreement on a number of issues, and the only matters remaining for our decision involve the income tax consequences of certain payments made by petitioners to Marguerite Murphy as alleged rent on certain machinery used by petitioners in their respective businesses. Some of the facts have been stipulated and are so found, all stipulated facts being incorporated herein by this reference. Petitioner Ernest V. Berry (hereinafter sometimes referred to as Berry) is a resident of California. His income tax returns for the years 1953, 1954, 1955, and 1956 were timely filed with the district director of internal revenue at Los Angeles, California. Until October 1955, Berry operated a sole proprietorship known as Precision Enginereing Co. (hereinafter sometimes referred to as Precision). His income tax returns were prepared for calendar year accounting periods, with the income and expense of Precision being reported on the accrual basis and his other income and expense being reported *159 on the cash basis. The income tax returns filed by Berry in the years in question showed the following net (taxable) incomes: Year
Net Income
1953
$13,595.06
1954
24,338.32
1955
29,778.84
1956
20,075.98
Precision was a machine shop business engaged principally in hard chrome plating, repairing, and grinding of crankshafts and camshafts. Ernest V. Berry, Inc., (hereinafter sometimes referred to as Corporation) is a corporation organized under the laws of the State of California with its principal place of business at Los Angeles. On or about October 1, 1955, Corporation received the net assets of Precision in exchange for the transfer of all of the Corporation stock to Berry. Thereafter the business formerly operated by Precision was operated by Corporation. Corporation used the calendar year accrual basis for reporting its income and expense. Its returns for the short year commencing October 7, 1955, and ending December 31, 1955, and for the year 1956 were timely filed with the district director of internal revenue at Los Angeles, California. Berry and Blanche Berry were married in 1942. In November 1948, Berry filed a complaint for divorce in the Superior *160 Court of Los Angeles County, California. In April of the next year Blanche filed a cross-complaint for divorce, alleging extreme cruelty. An interlocutory decree was entered on January 8, 1951, granting a divorce to Blanche. There followed a considerable amount of litigation between Blanche and Berry, some of which involved disputed claims of Blanche with respect to community property and community income. It was not until April 17, 1956, that the parties reached an agreement settling all claims arising out of Blanche's community interest in any of Berry's property or income. A final divorce decree was then entered on August 27, 1956. An attorney named Frederick I. Frischling (hereinafter sometimes referred to as Frischling) represented Berry extensively in connection with the divorce proceedings. Although others may also have represented Berry in the years during which those proceedings were pending, Frischling's representation spanned the entire period, from the commencement of the action to the time of the final decree. Berry met Marguerite Murphy (sometimes known as Marguerite Hurley and usually hereinafter referred to as Marguerite) in early 1942. She was employed by him *161 later in that year. When first employed, she spent a few weeks learning to do straight grinding on a little machine used for training purposes, but she had no further machine experience, as she soon took on supervisory responsibilities in the shop office. The new duties included bidding on jobs, dealing with customers, and deciding what work could or could not be performed. Marguerite left Berry's employ in 1944 but returned in 1945. She worked for Berry, d/b/a Precision, until just prior to the birth of her daughter in September 1949. Thereafter she worked less steadily at Precision. In 1950 she worked no more than two days a week, and in 1951 she worked less than two days a week. Throughout this period she received $75 a week whether she worked or not. Berry is the father of the daughter born to Marguerite in 1949. Since that time Berry has been living with Marguerite and the child as would a family. Although Berry has had to spend considerable amounts of time away from California on business, Marguerite is held out by Berry as "Mrs. Berry" in the Palos Verdes area of California, where they reside, and the child is registered in school under the surname "Berry." During the *162 years in question, Marguerite was sent down to the shop to work in emergency situations. This happened only two or three times during 1953 through 1956, and she was never paid for such work after the latter part of 1953. Several years prior to 1951 Berry had sold certain cam grinding machinery and equipment to Karl Strand for $7,500. Strand operated the equipment on the premises of Precision under an agreement with Berry whereby Strand received two-thirds of the gross profit from the work performed by him. Under this arrangement Strand earned approximately $8,000 to $10,000 per year. On or about June 1, 1951, Strand sold the cam grinding equipment and machinery (hereinafter sometimes referred to collectively as the Strand equipment) for $10,000. Also sold in the same transaction, for $250, was certain related inventory. The bill of sale for the Strand equipment and inventory, executed June 1, 1951, recited that the purchaser was Marguerite. It acknowledged payment of $250 for the inventory and $1,000 for the Strand equipment. Provision was made for the $9,000 balance to be paid by Marguerite in monthly installments, which were to include interest at the annual rate of 5 percent. *163 These payments were to be in the amount of $250 on July 10, 1951, and on the tenth day of each remaining month in 1951. Thereafter they were to be in the amount of $200 a month until the balance due was paid in full. Payment was secured by a chattel mortgage of the equipment running to Strand. On June 1, 1951, there was executed also a purported lease agreement between Marguerite as "lessor" and Berry, d/b/a Precision, as "lessee." This document stated that Barry was to "rent" the Strand equipment from Marguerite for 5 years commencing July 1, 1951, with options to renew for 4 successive one-year terms at the same rate. The Strand equipment "lease" called for payments from Precision to Marguerite in the amount of $850 per month, payable on the first of each month, starting July 1, 1951. The first payment of $850 was made in advance on the June 1, 1951 date of the purchase of the equipment, however. The next payment to Marguerite, in the amount of $850, was made on July 16, 1951. The first payment from Marguerite to Strand following the down payment of June 1, 1951, was made July 17, 1951, in the amount of $250. Thus, only $400 of the initial payment to Strand was not covered *164 by an "advance rental" payment to Marguerite, and within a month and a half she had received "rental" payments in excess of the purchase payments required to be made to Strand as of such time. All other funds paid by Marguerite to Strand came from "rental" payments made to her by Precision. On two occasions Precision made payments directly to Strand that were credited to Precision's "rental" account with Marguerite. These were payments of $500 on December 28, 1951, and of $1,000 on February 8, 1952. The final payment to Strand was made June 20, 1955, prior to Corporation's succession to the business of Precision. On some date after the years in question, "rental" payments to Marguerite in the Strand equipment were terminated. Although the equipment was still being used to some degree by Corporation at the time of trial, Marguerite has not objected to the termination of payments. The Strand equipment has never been moved from its location at the time of its purchase, and Marguerite has made no effort to sell it. In early 1952 Berry considered using a grinder to be built by the Van Norman Company of Springfield, Massachusetts, in connection with an invention being developed for *165 use by Precision in the grinding of diesel locomotive crankshafts. Berry knew the type of machine he wanted, and he discussed the requirements with Frischling and the Van Norman representative. Marguerite did not participate in these discussions. Berry was not certain that the Van Norman grinder being considered could be utilized successfully for the purpose he intended. To the best of his knowledge, Van Norman had not theretofore manufactured any grinders of that particular model. However, Berry decided to experiment with the grinder, and a purchaser order was sent to Van Norman by Frischling on March 17, 1952. The order, which was in Marguerite's name, stated that the $28,795.50 net price would be paid by an initial payment of $2,000 plus 36 monthly payments thereafter of $841.08 each. It was further stated that the machine was to be rented to Precision at a monthly rental of $841.08, and that this lease would be assigned to the manufacturer to guarantee payment. Said order was not accepted, and subsequently a second order for the grinder was sent in the name of Marguerite to Van Norman on April 10, 1952. The $4,000 down payment called for by the second order was received by *166 Van Norman on April 11, 1952, and the order was entered by Van Norman on April 17, 1952. The $4,000 payment came from an advance, made by Frischling. On April 18, 1952, an agreement was executed by Marguerite and Berry whereby Marguerite purported to lease the Van Norman grinder to Precision for a term of 5 years, with options granted Precision to renew for 4 successive one-year terms. This document called for "rental" payments in the amount of $900 monthly, starting 30 days after notice from the manufacturer that the machine was ready for shipment. The "lease" provided that Precision would pay the freight from the factory to Precision's plant. In the normal rental situation the lessor would be expected to pay the freight. The Van Norman grinder was shipped on August 29, 1952, and arrived at the premises of Precision on September 24, 1952, where it was installed by Precision. Berry made certain changes to the machine in order that it could be used in connection with certain of his inventions. He does not remember discussing these changes with Marguerite. On April 16, 1952, Marguerite received $1,700 from Precision as alleged rental payments for April and May on the Strand equipment. *167 On May 29, 1952, the $1,700 was paid to Frischling as partial repayment of his loan. On July 22, 1952, Marguerite received payments totaling $5,950 from Precision as alleged rental payments for June through December 1952, on the Strand equipment. On August 11, 1952, she paid Frischling from these funds the $2,300 balance due him on his loan. On or about August 5, 1952, Marguerite received $2,000 from Berry's wholly-owned corporation Finance, Inc. This amount was charged to Berry personally on the books of that company and was reflected on the books of Precision as a "rental" payment for the Strand equipment or the Van Norman grinder. At the time she received this payment there was a substantial debit balance in Marguerite's "rental" account with, and in favor of Precision. The $2,000 payment was used by Marguerite to open a bank account. The next transaction with respect to this account was her deposit on October 31, 1952, of $3,900 paid to her by Precision that day as "advance rental" for September through December 1952, on the Van Norman grinder. The same day she withdrew from said account the sum of $4,795, which was paid immediately to the Van Norman Company as a further *168 and final down payment on the grinder. Thus all the funds used to pay the $8,795 down payment on the Van Norman grinder came from "rental" payments on the grinder and the Strand equipment. The $20,000 balance due on the purchase of the Van Norman grinder was financed through the California Bank, which took an assignment of a conditional sale contract from the Van Norman Company on November 3, 1952. As a result of the transaction, a loan in the amount of $20,000, plus a finance charge of $1,600, was entered in Marguerite's name on the books of the bank on November 5, 1952, and the Van Norman Company was paid its $20,000. In consideration of the financial accommodation given Marguerite by the California Bank, Berry executed a guarantee to the bank of loans made by it to Marguerite in amounts not in excess of $21,600. The guarantee agreement provided that the bank could proceed against Berry to recover the amount guaranteed without making any efforts to collect from Marguerite or to be satisfied from any security it might hold. The conditional sale contract required monthly payments of $900, the amount of the monthly "rental" called for by the written "lease"of the grinder. Payments *169 were due on the 20th of each month starting November 20, 1952. Twelve of such regular payments were made before the balance due was refinanced, on November 12, 1953, in the form of note taken by the same bank, secured by a chattel mortgage on the Van Norman grinder. Berry's guarantee applied to this refinancing of the original obligation to the bank. The chattel mortgage note required monthly payments of $825 beginning November 20, 1953. Said payments were duly made, and the note was paid in full on November 22, 1955, at which time the mortgage was released. All funds used to meet the payments required by the conditional sale contract and the note secured by the chattel mortgage came from "rental" payments made to Marguerite by Precision or Corporation. Both the Strand equipment and the Van Norman grinder were used in the business of Precision and Corporation during the years in question. The Van Norman grinder, like the Strand equipment, was still being used by Corporation at the time of the trial of this case. The monthly "rental" for the grinder had been reduced to $500 pursuant to a new 3-year lease dated January 1, 1958, but there is no evidence that any "rental" payments *170 thereon were made after 1960. In 1949 Marguerite acquired a frame and stucco apartment house at a cost of about $20,000. The income from this source in the years 1953, 1955, 1956, and 1957, net of expenses incurred in connection therewith, was $1,243.28, $2,320.06, $198.99, and ($194.42), respectively. The net income from the apartment house was used primarily to support Marguerite's mother. Marguerite's only other income in the years in question consisted of the "rental" payments from Precision and Corporation in respect of the above-described machinery "leases." Payments were not made to Marguerite regularly as called for by the "lease" documents. On a number of occasions large amounts were paid as "advance rent." On other occasions large amounts were accrued as "rent" owing but not paid. Payments with respect to the Van Norman grinder were accrued on the books of Precision and Corporation at the rate of $975 per month rather than at the $900 rate called for by the "lease" document executed in 1952. Neither Berry nor Frischling could explain the additional $75 amount; Marguerite was not certain as to the reason for it, but she thought it was related to an additional table that *171 was obtained for use with the machine. The amounts accrued on the books of Precision as machinery rent payable to Marguerite for the years in question were: Strand
Equip-
Van Norman
Year
ment
Grinder
Total
1953
$10,200
$11,700
$21,900
1954
10,200
11,700
21,900
1955
7,650
8,775
16,425
The following amounts were reflected on the books of Precision as rental payments made on the above machines: Year
Total
1953
$19,275
1954
19,575
1955
17,196
When Corporation took over the net assets of Precision in October 1955, it assumed as a liability shown on the books of Precision an account payable to Marguerite in the amount of $4,179, representing unpaid "rent" for the two machines. The amounts accrued on the books of Corporation as machinery rent payable to Marguerite for the years in question were: Strand
Equip-
Van Norman
Year
ment
Grinder
Total
1955
$ 2,550
$ 2,925
$ 5,475
1956
10,200
11,700
21,900
The following amounts were reflected on the books of Corporation as rental payments on the above machines: Year
Total
1955
$ 2,575
1956
27,304
Marguerite reported *172 as rental income on her income tax returns for the respective years the aforesaid amounts reflected on the books of Precision and Corporation as having been paid to her in the years in question. Checks for the "rental" payments were prepared by the accountant for Precision or Corporation, upon instructions from Berry. Some of these checks were deposited directly by the accountant to a bank account maintained by Marguerite. On certain other occasions such checks were cashed by the accountant. If Marguerite happened to be in the plant at such times, the cash was given to her. On occasions when Berry was in Los Angeles, the proceeds of "rental" checks cashed by the accountant were given to Berry for delivery to Marguerite. On April 6, 1956, three checks were issued to Marguerite by Corporation as "rental"payments. The amounts of these checks were $5,000, $4,179, and $3,000. The $3,000 was used as a down payment on a diamond ring purchased at an auction attended by Marguerite and Berry on April 8, 1956. The balance due on said ring was $8,217.60, and this sum was to be paid in $1,000 monthly installments. Although Marguerite testified she was the purchaser of the ring, the sales invoice *173 was in Berry's name and he signed as purchaser and the person obligated for the balance due. Berry testified that his reasons for preferring to rent rather than purchase the Strand equipment and Van Norman grinder were a lack of cash and the pendency of his divorce proceedings. A lease of the Strand equipment entered into at arm's length on June 1, 1951, would have required a monthly rental of $300, as opposed to the $850 monthly amount called for by the "lease" of such equipment executed by Berry and Marguerite. An arm's-length lease of the Van Norman grinder entered into on April 18, 1952, would have provided for a monthly rental of $850. Deductions were claimed by petitioners for the "rental" payments to Marguerite accrued as aforesaid on the books of Precision and Corporation. Respondent disallowed in full the deductions taken by Berry for the period during which Precision operated the business, determining that "it has not been shown that any part of the payments was in fact intended as rent." Berry admits that, although he is not related to Marguerite by blood, marriage, or partnership interest, the relationship between him and Marguerite is such that a careful scrutiny *174 of the details of the transactions involved herein would be justified for purposes of determining whether the "leases" were entered into at arm's length and called for rental payments that were reasonable in amount. By his own witnesses he has established that the amounts provided for by the agreements executed by him and Marguerite were in excess of what a reasonable rent would have been, and, in the case of the Strand equipment, grossly in excess thereof. Petitioner strongly urges, however, that he must be allowed as a deduction the amount, to be determined by us, which would have been fixed as rental for the machines in question in arm's-length leasing transactions. For this proposition he cites a number of cases involving leases between closely related parties (such as between family members or shareholders and their wholly-owned corporations) in which we did allow a rental deduction in the amount we found to be reasonable. See, e.g., Roland P. Place, 17 T.C. 199 (1951), affd. 199 F. 2d 373 (C.A. 6, 1952), certiorari denied 344 U.S. 927 (1953); Herbert Davis, 26 T.C. 49 (1956); Stanwick's, Inc., 15 T.C. 556 (1950) *175 affd. 190 F. 2d 84 (C.A. 4, 1951). These cases do not govern here, however. In each of them the Commissioner allowed part of the deduction claimed as rent, and he disallowed as something other than "rentals * * * required to be made" [1] only the excess over the amount allowed by him as rent. Here he allowed no part of the accrued payments as deductions for rent. Whereas in the above cases cited by petitioners, he was satisfied that the payments were at least in part for rent, here he asserts that, contrary to the formal documents, the realities of the situation are such that no part of the payments to Marguerite could have been for rent. *176 No citation of authority is necessary for the proposition that the incidence of Federal income taxation is not determined by the artifice of form when economic reality proves that substance of a situation to be other than the form would indicate. Neither the mere fact that the payments in question were labeled "rent," nor the fact that an obligation to make such payments might have been enforceable against Berry by Marguerite, establishes them as rental payments for purposes of the deductions allowable under the Internal Revenue Code. Shaffer Terminals, Inc., 16 T.C. 356 (1951), affd. 194 F. 2d 539 (C.A. 9, 1952). It is respondent's contention that the form in which the transactions here in question were cast does not reveal the true character of the situation. He insists that, in order that the tax consequences may comport with the substance of these transactions, Berry should be treated as having been the purchaser of the machinery involved. His argument is that Marguerite was in reality merely a conduit through whom Berry acquired such equipment, and that *177 the form of the lease arrangements was used merely for anticipated substantial tax benefits. It is clear to us that Berry's relationship with Marguerite not only is such that a careful examination of the amount of the "rentals" involved would be justified, but is such that a careful scrutiny of the whole transaction is called for. If one commences such an examination with a consideration of the explanations proffered by Berry for entering into the agreements involved, the artificiality of the arrangement is quickly brought to light. Berry said he preferred to rent the machinery rather than buy it, in part, because he lacked cash to do the latter. However, virtually every penny paid by Marguerite that was applied to the purchase price of the two machines came from the "rent" payments. These were paid her in advance where necessary for her to make the large down payment on the Van Norman grinder. Marguerite had no income available to apply to these payments other than the "rental" income, and the only credit extended for the purchases on anything other than the security of the machines themselves was extended only after Berry affixed his signature on a guarantee. Berry argues, *178 nevertheless, that to obligate himself to make payments on such machinery would have created a substantial liability on a balance sheet and thereby would have impaired his ability to borrow for Precision. There is no evidence that Berry was attempting to obtain such loans, but even if he were we fail to see why the machinery itself would not properly be shown as an asset greater in amount than the remaining payment liability on any balance sheet drawn up for such purposes. Furthermore, we think it highly unlikely that any potential creditor would be more favorably impressed by the exorbitant obligations he undertook as a lessee. We have not hesitated to find payments not to be for rent in sale and lease-back situations between related parties where the payments for the purported purchase could be financed solely through the rent received, particularly where, as here, such rental payments were inordinately high in amount. See Shaffer Terminals, Inc., 16 T.C. 356 (1951), affd. 194 F. 2d 539 (C.A. 9, 1952); Catherine G. Armston, 12 T.C. 539 (1949), *179 affd. 188 F. 2d 531 (C.A. 5, 1951). As was said in Kirschenmann v. Westover, 225 F. 2d 69, 71 (C.A. 9, 1955), certiorari denied 350 U.S. 834 (1955): It is true, taxpayers divested themselves of title to the property, yet they farmed the land as before, and in effect it was their earning power which formed the basis for the entire transaction, including payment of the purchase price. Tax consequences are determined not from the formal aspect of a transaction, but from the actual substance of a piece of business. What is found here lacks business meaning for tax purposes. * * * We see no reason why the reasoning applied in these cases should not apply under the facts in this case. The cited cases also rely on the fact that the party seeking deductions for rent therein had complete control over the property in question and the right or power to use the same as he wished, lacking only bare legal title. This is certainly equally true here, as is demonstrated by Berry's continued use of the Strand equipment after terminating the payment of "rent" sometime after the "lease" expired, and the apparent lack, after 1960, of any obligation to pay *180 "rent" on the Van Norman grinder. It is further evidenced in the case of the latter machine by his making changes to the machine without any feeling that this could only be done after clearing such action with Marguerite. Berry asserted all the attributes of ownership of the machinery, and there is nothing in the record indicating Marguerite ever challenged or would challenge this assertion other than the "leases" themselves, which would accomplish the salutary effects of a reallocation of income within a group that amounted to, and should be treated for these purposes as, a family. Berry's effective ownership of the property must be recognized for tax purposes. White v. Fitzpatrick, 193 F. 2d 398 (C.A. 2, 1951), certiorari denied 343 U.S. 928 (1952). Berry contends that the divorce proceedings between him and Blanche constituted a non-tax-avoidance reason for his preferring to rent the machines rather than to buy them. Blanche would have community rights in the community property and income. The arrangement with Marguerite would, presumably have the double effect of keeping the machine free of community property claims and of reducing the community *181 income by the amount of the rental payments, thus freeing from claims of Blanche substantial amounts of money that could be used by the residents of the home at Palos Verdes. We recognize that the divorce was probably one of Berry's reasons for arranging the purchase as he did. [2] But to the extent that "rental" payments were paid or accrued for for this reason they would not be, in the language of the tax statute, "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business," [3] and hence would not be deductible. See United States v. Gilmore, 372 U.S. 39 (1963). See also I. L. Van Zandt, 40 T.C. 824 (1963), on appeal (C.A. 5, Nov. 4, 1963); W. H. Armston Co. v. Commissioner, 188 F. 2d 531 (C.A. 5, 1951), affirming 12 T.C. 539 (1949); White v. Fitzpatrick, supra.
*182 We have already indicated our feeling that, from the point of view of Precision, the "leases" were bad business. The prospective tax saving from the reallocation of income between closely related parties who were not entitled to file a joint return [4] is "too obvious to be overlooked." 58th Street Plaza Theatre, Inc., 16 T.C. 469, 476 (1951), affd. 195 F. 2d 724 (C.A. 2, 1952), certiorari denied 344 U.S. 820 (1952), rehearing denied 344 U.S. 882 (1952). We find that the payments in question were not, at least for Federal income tax purposes, rental payments, but that they were payments for the purchase of the machines and, to the extent made in amounts exceeding the respective purchase prices thereof, personal expenses, [5] neither of which types of expense is deductible. [6] On the authority of the cases cited, we uphold respondent's denial of deductions to Berry for the amounts accrued on the books of Precision as "rent" owed to Marguerite. *183 Consistently with the determination discussed above, respondent disallowed deductions to Corporation for amounts accrued on its books as rental payments to Marguerite. He did, however, allow a deduction of an amount determined by him to be reasonable as rental to Berry for the use of the Van Norman grinder. We sustain the denial of deductions for Corporation's accrued rental payments to Marguerite. We also sustain the determination of the amount that should be allowed Corporation as deductions for rental to Berry for the use of the Van Normangrinder. Respondent determined this amount to be 2 percent of the purchase price thereof per month. Petitioners assert that their witness established a 3 percent figure to be reasonable. But the witnesses testified as to the rental market in 1951 and 1952, and they emphasized shortages caused by the Korean War; and our adopting a 3 percent figure in connection with our findings above was for purposes of testing the agreements with Marguerite. We think the rental market to be considered for purposes of the matter we are now concerned with was the maret in October 1955, when Corporation took over the business of Precision. For lack of proof by *184 petitioner on this point, and because of the approximately 2 percent figures in evidence as contained in leases dated June 1, 1954, and January 1, 1958, we approve the use of a 2 percent figure. A deduction based on the same figure should also be allowed Corporation for rent to Berry on the Strand equipment for the years in question. Both petitioners contend that any amounts claimed as rent deductions and not allowed as such should be allowed as expenses for services rendered Precision and Corporation, respectively, by Marguerite. The record contains no proof by which we can determine in which years she performed any services, nor by which we can find what amount of compensation would be reasonable, however. Furthermore, there is no evidence that any payments in the years in question were intended as compensation. Such deductions cannot be allowed, J. J. Kirk, Inc., 34 T.C. 130 (1960), affd. 289 F. 2d 935 (C.A. 6, 1961). Respondent increased Berry's income for 1955 and 1956 by amounts incurred by Corporation as payments to Marguerite, under the theory that such are to be treated as rental and constructive dividend income to Berry. Berry has not pursued *185 this issue, and we decide it, accordingly, for respondent. Decisions will be entered under Rule 50. Footnotes
1. The statutory language pertinent to this case is contained in sec. 162(a), I.R.C. 1954, which provides: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. The related language of the 1939 Code, contained in sec. 23(a)(1)(A) thereof, is in all crucial respects identical.↩
2. There would appear to be some likelihood that Blanche could have asserted the realities of the situation however, as respondent here is doing. See Dandini v. Dandini, 120 C.A. 2d 211, 260 P. 2d 1033↩ (1953). 3. See Footnote 1, supra.↩
4. See Albert Gersten, 28 T.C. 756 (1957), affirmed on this issue 267 F. 2d 195↩ (C.A. 9, 1959).
5. Petitioners contend that the essence of respondent's determination was a finding of fraud, and that the burden of proof on this matter consequently should be on respondent. We have not reached this question, because our findings have not been made on the basis of a burden of proof theory. We are completely satisfied as to the facts involved from the record presented. ↩
6. See sec. 162(a), I.R.C. 1954, sec. 262, I.R.C. 1954↩, and their counterparts in the 1939 Code.