JACK E. ZAGER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zager v. Commissioner
Docket No. 30238-82.
United States Tax Court
T.C. Memo 1987-107; 1987 Tax Ct. Memo LEXIS 103; 53 T.C.M. (CCH) 230; T.C.M. (RIA) 87107; February 23, 1987. Jack E. Zager, pro se. Hugh M. Spall, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1979 in the amount of $20,731. The sole issue for determination is whether petitioner realized $63,467 of ordinary income during the taxable year in issue as a result of his withdrawal as a partner from an accounting partnership. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. [1]
*108 Petitioner resided within the state of Washington when he filed his petition in this case. Prior to November 30, 1978, petitioner was a partner in the accounting firm of Niemi, Holland & Scott (hereinafter referred to as "NH&S"). Both petitioner and NH&S were cash basis taxpayers. At all times relevant to this litigation, NH&S had a tax year ending September 30. A partnership agreement dated June 30, 1976, governed petitioner's dealings with NH&S. During his association with NH&S, petitioner did not contribute sufficient capital to meet his agreed-upon capital contribution. Petitioner's required contribution to partnership capital was $37,500. As of September 30, 1978, petitioner met his contribution by an actual contribution of $7,116 and an annually renewable note of $30,384. The unpaid capital contribution of $30,384 was not included as part of petitioner's cash basis capital account, but was entered in a separate account on the books of the partnership. [2]
*109 NH&S permitted petitioner salary draws which exceeded his annual share of the partnership's cash basis profits. At the end of the partnership year, repayment for these excessive draws was required by note. According to the books of NH&S, as of September 30, 1978, petitioner's accumulated cash draws exceeded his share of the partnership's cash basis profits by $53,698.55, giving petitioner a negative cash basis capital account on that date. On November 30, 1978, petitioner withdrew from NH&S to establish his own accounting practice. The partnership agreement states in paragraph 15: Withdrawal. Any partner may withdraw from the partnership at the end of any fiscal year upon giving written notice to the Executive Committee at their principal office not less than six (6) months prior to the end of such fiscal year. A withdrawing partner shall be entitled to payments for his capital account as determined in paragraph 10 and for twenty-five (25) percent of his RBF [retirement benefit factor] as determined in paragraph 11 and subject to the conditions stated therein. If the withdrawing partner shall not agree not to engage in the practice of public accounting, including any *110 of the specialties related thereto, the partner shall not be entitled to any payments for RBF. The amount due the partner for his capital account and RBF as determined under paragraphs 10 and 11 shall be reduced by (1) the fair value of any assets distributed to the partner, (2) obligations of the partner to the partnership or any obligations of the partner which may become the responsibility of the partnership and (3) any losses directly associated with the partner's lack of cooperation in implementing the withdrawal as may be determined by the partnership. Paragraph 10 governs petitioner's payment for his capital account and states, in pertinent part: For purposes of determining payments due a partner or his estate in the event of retirement, disability, death or withdrawal, the records of the partnership shall be brought up to date as of the end of the month preceding the date of retirement, disability, death or withdrawal. The accounts will be adjusted to conform to the management statements to reflect accruals and adjustments pertaining to assets (exclusive of investments other than investments in civic and community organizations), liabilities and capital accounts, and the *111 capital accounts of each partner shall be adjusted to reflect income or losses for the current year to date and drawings for the current year to date, including drawings in excess of salary for the partial month following the closing. Investments will be valued and the increase or decrease from book value will be allocated to the partners' capital accounts on the ratio of the average (arithmetic mean) partnership units in effect for the period beginning with the year of acquisition and ending with the period valuation is required. The determination by a majority of the surviving partnership units as to the necessary adjustments to properly reflect the fair value of assets, liabilities and capital accounts shall be final and binding upon all parties. The amount so determined shall be paid to the partner, his estate or designated beneficiaries in equal monthly installments over a period of ten years with interest at the rate established for notes payable to partners in the year of retirement, disability, death or withdrawal. Such payments will consist of payments to a retiring partner for his interest in partnership property and guaranteed payments to a retiring partner for his *112 interest in unrealized receivables and work in process.
Notwithstanding the above provision relating to payment of amounts due a partner, special provision is hereby granted to the partner, his estate or designated beneficiaries in regard to term investments consisting of ownership certificates and debt instruments (other than investments in civil and community organizations). In lieu of payment of the partner's share of such investments, the partner, his estate or designated beneficiaries may request in-kind distribution of the partner's pro rata share of such investments. The partner's pro rata share of such investments shall be determined by the ratio of his capital account to the total of all partners' capital accounts after adjustments to assets, liabilities and capital accounts as above specified. In-kind distributions will be treated as cash distributions and applied to payments first due the partner, his estate or designated beneficiaries, unless otherwise agreed to by the surviving partners. [Emphasis supplied.] Paragraph 11 sets forth the computation of a partner's retirement benefit factor ("RBF") for retirement, disability, death or withdrawal of a *113 partner and states: The Retirement Benefit Factor (RBF) is an unfunded deferred compensation plan for the mutual benefit and protection of the partnership and its partners. The specific intent and purpose of the plan is to encourage the retention of partners by providing them with deferred compensation at the time of their retirement, disability or death, as well as withdrawal under certain limited situations. The partner's consideration to the partnership for RBF distributions is his continued loyalty to the firm during the period in which he is receiving such distributions and that he refrain from competing in any way with the firm's activities. * * * A partner's RBF shall be the cumulative annual increases in business volume allocated to him on the ratio of partnership units or in such other manner as determined by the Executive Committee and approved by a majority of the partnership units for each fiscal year. * * * Payments to a partner for RBF so determined, * * *, will be in equal monthly installments over a period of ten years without interest. Such amounts shall be construed as guaranteed payments to a retiring partner. [Emphasis supplied.] On November 5, 1979, NH&S *114 gave petitioner the firm's final accounting of petitioner's partnership interest. NH&S determined that petitioner had an accrual basis capital account worth $94,503.41. This $94,503.41 consisted of unrealized receivables and work in progress. Under paragraph 10 of the partnership agreement, petitioner would have been entitled to a payment of $94,503.41 in liquidation of his partnership interest if he had not had a negative cash basis capital account and a note payable. As a result, NH&S charged petitioner's note payable and negative cash basis capital account against the value that they computed for petitioner's accrual basis capital account. In addition, NH&S transferred $4,208 of accounts receivable to petitioner to reflect the remaining amount in his accrual basis capital account which reflected retirement plan benefits or termination pay. [3]
*115 NH&S reported that petitioner received a guaranteed payment of $63,467. Petitioner reported this sum as ordinary income on his 1979 Federal income tax return. Petitioner subsequently filed a Form 1040X for the taxable year 1979 denying that he owed taxes on his distribution from NH&S. On his 1040X return, petitioner explained that $63,467 of income was picked up from the Form 1065, Schedule K-1 issued by NH&S for their fiscal year ended September 30, 1979. However, petitioner asserted that the $63,467 amount resulted from the cancellation by the partnership of petitioner's obligation to repay his negative capital account. Due to his alleged insolvency, petitioner asserts that such amount is not ordinary income to him due to "exceptions to the debt cancellation rule." On September 30, 1982, respondent issued a notice of deficiency of $20,731 asserting that the $63,467 amount represents a taxable liquidation of a partnership interest. OPINION Respondent's determination of the deficiency is presumptively correct. Welch v. Helvering,290 U.S. 111, 115 (1933). In order to overcome this presumption, petitioner must offer evidence that shows the determination *116 is erroneous, Guersten v. Commissioner,267 F.2d 195, 199 (9th Cir. 1959), affg. in part 28 T.C. 756 (1957), and petitioner bears the burden of proof. Rule 142(a). [4]
Respondent asserts that petitioner's withdrawal from NH&S resulted in a liquidating distribution from which petitioner must recognize ordinary income under section 736(a). On the other hand, petitioner contends that, while he received a section 731(a)(1) gain of ordinary income generated by a section 752(b) "distribution of money," his insolvency causes the gain to be excluded from gross income as a cancellation of indebtedness under section 108(a)(1)(B). We agree with respondent. Under Subchapter K of the Internal Revenue Code, there are two ways in which withdrawing partners may characterize the disposition of their partnership interests: the transaction may be structured either as a "sale" of the partnership interest pursuant to section 741, or as *117 a "liquidation" of that interest pursuant to section 736. The net economic result is the same under either approach, although the tax consequences to the withdrawing and continuing partners vary greatly. If characterized as a section 741 "sale," any tax benefits flow to the withdrawing partner, who may be permitted to report any gain that results therefrom as capital, rather than ordinary income gain. See sections 741, 751. Correlatively, the payments are not deductible by the continuing partners, but simply are capitalized as the purchase price of the withdrawing partner's interest. By comparison, a section 736 "liquidation" with payments to the withdrawing partner characterized as "guaranteed payments" results in a tax benefit to the continuing partners who may deduct those guaranteed payments from partnership income. Under section 736, the withdrawing partner must report these payments as ordinary income. Sec. 736(a)(2); sec. 707(c). It is obvious that the withdrawing and continuing partners have adverse interests in selecting the manner of withdrawal. Consequently, the form of the transaction may become a major negotiating point between the parties. As a result, the partners *118 through arm's-length negotiation can determine whether to take the "sale" route of section 741 or the "liquidation" route of section 736 and thereby allocate the tax burdens among themselves. Cooney v. Commissioner,65 T.C. 101, 109-110 (1975); Foxman v. Commissioner,41 T.C. 535, 551-552 (1964), affd. 352 F.2d 466 (3d Cir. 1965). As we review the record in the instant case, it leaves little doubt that the transaction before us was a liquidation of the withdrawing partner's interest in the partnership. The partnership agreement expressly prescribes a formula for the liquidation of a withdrawing partner's interest. In fact, the language of paragraph 10 of the partnership agreement follows the provisions of section 736 in stating that the payments "will consist of payments to a retiring partner for his interest in partnership property and guaranteed payments to a retiring partner for his unrealized receivables and work in process." [5] Therefore, we find that the transaction was a liquidation under section 736 and not a sale under section 741. [6]
*119 Section 736 divides payments by the partnership in liquidation of the interest of a retiring partner into two categories: (1) payments made for a partner's interest in partnership property other than unrealized receivables under section 736(b) and (2) all other payments under section 736(a). [7] Turning to the mechanics of section 736, we must first determine whether any part of the payment received by petitioner was "in exchange for the interest of such partner in partnership property" within section 736(b). If no section 736(b) payment exists, a section 736(a) payment has been received. *120 In reviewing the record, the parties have severely limited our ability to characterize or apportion the payment due to their failure to set forth clearly the adjusted basis and fair market value of the partnership's unrealized receivables, capital assets, section 1231 assets and liabilities, and the apportionment of such amounts to petitioner. See Milliken v. Commissioner,72 T.C. 256, 261 (1979), affd. without published opinion 612 F.2d 570 (1st Cir. 1979). Moreover, the parties did not submit the partnership's relevant Form 1065, Schedule K-1 into evidence. However, section 736(b)(2)(A) specifically excludes payments for unrealized receivables from section 736(b). Thus, as petitioner's accrual basis capital account represented petitioner's share of accounts receivable and work in process as of September 30, 1979, the liquidation payments for unrealized receivables automatically fall within the general rule of section 736(a) and are taxable as ordinary income. [8] Section 736(a)(2) specifies that, except as provided in section 736(b), a payment made in liquidation of the interest of a retiring partner shall be considered as a "guaranteed payment, *121 " described in section 707(c), [9] if the amount thereof is determined without regard to the income of the partnership. Holman v. Commissioner,66 T.C. 809, 813-814 (1976), affd. 564 F.2d 283 (9th Cir. 1977). As the amount does not correspond to petitioner's distributive share, such payment is a section 736(a)(2) amount. While we cannot reach a figure of $63,467 as a guaranteed payment on the basis of the figures before us, the parties have stipulated that the partnership deducted this amount as a guaranteed payment. The parties' allocation of the withdrawal payments between payments for petitioner's interest in partnership property and other payments will normally be respected. See sec. 1.736-1(b)(1), Income Tax Regs. Moreover, petitioner presented no evidence or arguments that would indicate that respondent's determination or the partnership's allocation was improper. Thus, we find the $63,467 amount is a section 736(a)(2) guaranteed payment, resulting in ordinary income to petitioner. *122 Turning to petitioner's contentions, petitioner not only failed to note section 736 in his briefs but devoted nearly all of his efforts to discussing his alleged financial insolvency and its effect on the partnership provisions. [10] However, on the basis of the record before us, we find that petitioner has not proved his insolvency. Petitioner's claim that his liabilities exceed his assets is not credible. Not only did petitioner file individual financial statements with Ranier National Bank which stated a positive net worth both before and after his withdrawal from NH&S, but petitioner presented no witnesses to verify his financial position. [11] The evidence and testimony of petitioner are confused, contradictory and self serving. As a result, while we are concerned that neither respondent nor petitioner explained how the $63,467 guaranteed payment was calculated, respondent's determination is afforded a presumption of correctness and petitioner has done nothing to overcome this presumption. *123 On the basis of the record, we hold that petitioner has failed to carry his burden that respondent's determination that he received ordinary income in the amount of $63,467 is erroneous. Accordingly, we sustain respondent's determination of a statutory deficiency of $20,731. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. In accordance with the provisions of Rule 90, Tax Court Rules of Practice and Procedure, respondent twice requested admissions by petitioner. Under Rule 90(c), each matter in respondent's request for admissions is deemed admitted unless, within 30 days after service of the request or within such shorter or longer time as the Court may allow, petitioner files a written answer or an objection specifically admitting or denying the matter involved in whole or in part, or asserting that it cannot be truthfully admitted or denied and setting forth in detail the reasons. Petitioner did not so respond and thus, under Rule 90(e)↩, respondent's requested admissions are conclusively established. The admissions include exhibits which are accepted into evidence. The evidence established by our deemed admissions, including exhibits, likewise is included by this reference in our findings.
2. Under paragraph 3 of the partnership agreement: Amounts required by the partnership to fulfill a partner's capital requirements shall be recorded as notes receivable from the partner under such terms as determined by a majority of the partnership units and set forth in the notes.↩
3. Petitioner did not agree to NH&S's final accounting and requested an additional $5,000 payment in cash. Petitioner was not paid the additional $5,000 but transferred $4,208 in accounts receivable. Moreover, instead of receiving payments in liquidation of his partnership interest over a ten-year period as outlined in paragraphs 10 and 11 of the partnership agreement, the partnership accommodated petitioner's request for a "quick pay-out" and liquidated his interest entirely in 1979.↩
4. All rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
5. Sec. 736 provides: (a) PAYMENTS CONSIDERED AS DISTRIBUTIVE SHARE OR GUARANTEED PAYMENT. -- Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered -- (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership. (b) PAYMENTS FOR INTEREST IN PARTNERSHIP. -- (1) GENERAL RULE. -- Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a). (2) SPECIAL RULES. -- For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for -- (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will. ↩
6. Under sec. 761(d), a distribution which terminates a partner's entire interest in the partnership is a liquidating distribution.↩
7. If a partner receives money from the partnership under an obligation to repay the money, there is a loan to the partner and not a distribution of partnership property. The loan is treated as a transaction between partner and nonpartner under section 707(a). Sec. 1.731-1(c)(2), Income Tax Regs. If the partnership cancels the partner's obligation to the partnership, petitioner is considered to have received a distribution of money at the time of cancellation which is income from the discharge of indebtedness. Sec. 61(a)(12); sec. 1.731-1(c)(2), Income Tax Regs.
Here, petitioner admits that the partnership retained petitioner's share of the partnership's co-mingled unrealized receivables and depreciable personal property as an offset against the notes and loans due the partnership. We find that the partnership did not cancel petitioner's debt but utilized the income due petitioner in his accrual basis capital account to offset the notes and loans. As a result, under the facts of this case, we find that petitioner received a distribution of money from the partnership for the value of his notes and loans outstanding and then paid them off with the distribution. While section 736 does not clearly define "payment" in all circumstances, a distribution of money is clearly a payment. Sec. 1.736-1(a)(2), Income Tax Regs.
Petitioner did not receive cancellation of indebtedness income and thus we will not address his cancellation of indebtedness arguments.↩
8. See Lynch v. Commissioner,T.C. Memo. 1982-305↩. Payments which fall within the ambit of sec. 736(a) are exempted from sec. 751(b) treatment by sec. 751(b)(2)(B). If petitioner's withdrawal was characterized as a sale of his interest to the remaining partners under sec. 741, a similar result would be obtained through the operation of sec. 751(a).
9. Sec. 707(c) states: (c) GUARANTEED PAYMENTS. -- To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).↩
10. In pointing to sec. 731 in his briefs, petitioner overlooked sec. 731(c) which states that sec. 731, "shall not apply to the extent otherwise provided by section 736." Sec. 731(c); sec. 1.731-1(c)(1)(i), Income Tax Regs. See also n. 7, supra.↩
11. During 1979 and 1980, petitioner presented two financial statements to Ranier National Bank where he computed his net worth to be around $100,000. While petitioner did pay alimony to his wife pursuant to a separation agreement dated September 21, 1978 and a final decree of dissolution dated January 18, 1979, and entered into a lease agreement, we do not find these facts to be dispositive of petitioner's financial status. Moreover, petitioner offered no evidence that he was ever called upon to honor his personal guarantee of Unital, Ltd.'s line of credit, a company in which he served as an officer and director and was a 50% shareholder.↩