Albert GERSTEN, Myron P. Beck and
Ann H. Beck, Milton Gersten and
Mary Gersten, Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 15945.

United States Court of Appeals
Ninth Circuit.

Feb. 27, 1959.

Tannenbaum, Steinberg & Shearer, Jacob Shearer, Beverly Hills, Cal., for petitioners.

Andrew F. Oehmann, Acting Asst. Atty. Gen., Louise Foster, Melva M. Graney, Joseph F. Goetten, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before FEE, BARNES and HAMLIN, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

This appeal involves two questions. First, was the Tax Court correct in upholding the determination of the Commissioner that the contract rights distributed to stockholders had an ascertainable fair market value as of the date of the dissolution of a corporation? Second, was a taxpayer who was a resident of California, against whom a first wife had there obtained an interlocutory decree of divorce, and who had himself obtained a Mexican divorce from her and remarried the same day, entitled to file a joint income tax return with the second wife before the California divorce became final?

As to the first question, the facts are summarized below. Albert Gersten and Myron Beck were the controlling stockholders of four corporations which were engaged in the business of subdividing tracts and constructing houses thereon and selling such houses. Milton Gersten was a stockholder in only two such corporations.

It was essential to the subdivision of the tracts acquired by these corporations and the sale of the houses to be constructed thereon that water facilities be provided therefor. San Gabriel Valley Water Company, a water utility corporation of California, held a franchise to operate in the area. The record shows no other water supply available for such subdivisions. Contracts in slightly varying terms were entered by the four corporations with San Gabriel, whereby the latter agreed to extend its water lines into these subdivisions, and the corporations agreed to pay the cost of the extensions. San Gabriel then charged each home in the subdivision the minimum rate for water. The rates were regulated by law. Under these contracts with the subdividing corporations, payments were to be made by San Gabriel on a basis, roughly, of one-third of its gross receipts from the sale of water to homes in the particular subdivision. These payments were to continue for ten years unless the amount of the original cost of the extensions had been repaid sooner.

The subdivision proceeded, the houses planned were all constructed, and San Gabriel extended its lines and furnished water to the homes. The subdividing corporations did not acquire title to any of these facilities. The four corporations were dissolved by December 31, 1950. Payments had been made by San Gabriel on all the contracts but one. However, substantial amounts remained unpaid on each at the time of dissolution. The contracts were transferred from the dissolved corporations to their stockholders, taxpayers, who received these together with all the other corporate assets.

In making up income tax returns, taxpayers did not assign any value to their respective interests in such contracts in arriving at the gain realized upon the liquidation of the corporations.

The Commissioner determined that these water contracts had a fair market value at the time of the dissolution and distribution to the stockholders. The Tax Court upheld this determination. The trial court found, on the basis of only six casual sales of such contracts at an undetermined price, that similar contracts were in fact bought and sold. Obviously, the market for water contracts on a subdivision must be limited, since the building of such projects is somewhat constricted and the type contract here is not necessarily universal.

There was expert testimony that a refund of anywhere from sixty-five per cent to about one hundred five per cent, with an average of about seventy per cent, of the original payment might be expected therefrom. Various conditions were indicated which might affect the amount of recovery. The time of completion of the houses of a particular subdivision and the sale and occupancy thereof were shown to be of importance. The amount of water used by the householders fluctuated according to conditions and, of course, vitally affected the amount of the payments.

It is, of course, apparent that neither San Gabriel Water Company nor taxpayers could compel the householders in this subdivision to continue the purchase of water in the amounts which were being taken at the time of the transfer. There could be no assurance at what rates, to what amounts or for how long a time the payments from each householder would continue. The record shows no other available source of water for these subdivisions. It must be assumed the rates would not fluctuate unreasonably since San Gabriel was subject to the jurisdiction of the Public Utilities Commissioner of the State of California. From all that appears in the record, it had a virtual monopoly of water supply in the area under its franchise.

Upon this basis, the Tax Court determined that the fair market value of these contracts at the date of dissolution of the corporations and distribution to the stockholders was at least fifty per cent of the unpaid balance.

Taxpayers seem to admit, as they are, of course, required to by the uncontradicted record of payments actually made on these very contracts, that they had a substantial value. Their contention is that no "fair market value of the property" thus transferred to them from these corporations can be ascertained with a sufficient degree of certainty to require declaration. In any event, it is urged that, under the well established concept of annual accounting for income tax purposes, they need only report in the year of receipt moneys payable to them by San Gabriel subsequent to the dissolution.

■■ It is not necessary to find any actual sales of like articles to establish a market value.[1] The varying conditions to which taxpayers refer might affect the value of stock in a closely held corporation of which there were no sales on the open market.[2] Such circumstances would not indicate the stock had no actual market value. Since taxpayers chose to liquidate these corporations in this case, they cannot complain that the time of setting the market value of the contracts was brought about by their own acts.[3]

Taxpayers rely primarily upon three opinions, which, according to their contention, lay down a rule of law that a fair market value for such a contract can never be established at the date of liquidation. In Burnet v. Logan, 283 U. S. 404, 51 S.Ct. 550, 75 L.Ed. 1143, Mahoning Company, a mining organization, whose stock had been partly owned by the Adams and Hitchcock Company, apportioned any ore extracted by it among its shareholders according to their respective stock holdings. The shareholders in Adams and Hitchcock Company, including taxpayer, subsequently sold their shares to another steel company. The consideration for this sale was part cash and part in the agreement of purchaser to pay annually thereafter for distribution among the selling stockholders sixty cents for each ton of ore apportioned to it. It was there held that until the receipts by taxpayer under this contract shall have equalled the value of

1. Doric Apartment Co. v. Commissioner of Internal Revenue, 6 Cir., 94 F.2d 895, 897; Whitlow v. Commissioner of Internal Revenue, 8 Cir., 82 F.2d 569, 574.

2. Crowell v. Commissioner of Internal Revenue, 6 Cir., 62 F.2d 51; O'Malley v. Ames, 8 Cir., 197 F.2d 256, 258.

3. In re Williams' Estate, 9 Cir., 256 F.2d 217, 219.

her shares in March, 1913, they constitute a return of capital.

It seems obvious this decision does not lay down any general rule which must be followed in the case at bar at any and all events. Furthermore, the above decision is distinguishable on the facts. There the mining company was operating under a lease made in 1895 for 97 years, which did not require a maximum or minimum production of ore and did not compel any definite payments for any year.

While there are other distinctions [4] upon which we might elaborate in Westover v. Smith, 9 Cir., 173 F.2d 90, the assigned contract was indefinite in time and there was no requirement on the part of the producing company either to sell or to manufacture any machinery. This Court therefore followed the Logan case. In Commissioner of Internal Revenue v. Carter, 2 Cir., 170 F.2d 911, it is said:

> "In the corporate liquidation she also received 32 oil brokerage contracts which the *parties stipulated* had no ascertainable fair market value when distributed." [5]

The statute provided that the amount realized from the disposition of the stock by liquidation should be the sum of money received "plus the fair market value of the property [other than money] received." [6] There was therefore some basis for a finding of fact that, under all the circumstances, these contracts may have had a fair market value which was ascertainable as of the dates of corporate dissolution.

Immediately another difficulty arises. The Commissioner made a determination that the contracts were to be valued at fixed sums which approximated fifty per cent of the amount unpaid thereon. The Tax Court did not affirm or repudiate this determination squarely, but entered a cryptic conclusion:

> "The contracts had a fair market value at the time of Richard's [one of the subdividing corporations] dissolution, equal, at least to the amount determined by the respondent [Commissioner]."

This does not constitute a finding of fact as to the fair market value. There was evidence in the record upon which the Tax Court might well have based a dollar and cents figure which would far exceed this percentage estimate. True, taxpayers introduced no evidence because of their contention that no fair market value was ascertainable. But the Commissioner introduced evidence. From this evidence, it might have been concluded that the fair market value was more than seventy per cent of the total original payment, and the court recited this figure in the findings. But the record also indicated that the recovery might be (as has been heretofore noted) as much as one hundred five per cent of the amount paid therefor on the specified date.

The Tax Court also recited that the Commissioner "determined that such contracts had a fair market value of 50 per cent of the amount which remained unpaid on June 22, 1950, or $17,709.48," and also "determined that each of the contracts did have a fair market value" upon liquidation. The Tax Court unquestionably affirmed the determination that each of these contracts had a fair market value. In view of the testimony above noted, the finding that the fair market value was equal at least to the amount determined by the Commissioner clearly shows that such value was at least fifty per cent of said amount unpaid, but may well have been over one hundred per cent thereof. However, the only possible basis for the decision is that the fair market value could be set "without resort to mere estimates, assumptions,

---

4. The record contained an agreement similar to that in the Carter case, infra, to which the court does not refer in the opinion.

5. At page 911, emphasis added.

6. Internal Revenue Code, 1939, § 111(b), 26 U.S.C.A. § 111(b).

and speculation."[7] If a fair market value of $17,709.48 had been pinpointed, this Court would have been bound to consider whether the finding was clearly erroneous. The failure to make a positive finding in view of the evidence prevents affirmance.

■ The responsibility of the Tax Court was to fix a definite amount as the fair market value.[8] That tribunal was not bound by the presumption of correctness of the determination. The presumption disappeared upon the production of evidence from which the determination could be found inaccurate.[9]

■ This is a serious problem for the taxpayer. If the fair market value as of date of dissolution be overestimated, taxpayer might be subject to payment of capital gain taxes which the event will not justify. If underestimated, taxpayer may be subjected to payment of ordinary income taxes on sums received in excess of fair market value figure set.[10] These factors do not control or have bearing upon the problem before the court, but do highlight its seriousness.

The cause must therefore be remanded upon this phase to the Tax Court to permit the taking of further testimony to determine whether any fair market value can be found in the light of the cases relied upon by taxpayers and the necessity of setting an exact and accurate sum in dollars and cents.

The second question has been set out above. The Tax Court held against Albert Gersten. The decision of that tribunal was correct.

Lucille Gersten obtained an interlocutory decree of divorce from Albert Gersten on April 3, 1950, in the courts of California. Albert obtained a decree of divorce from Lucille on November 2, 1950, in the State of Chihuahua, Mexico. On the same day, he married Bernice in Juarez. Although both Albert and Bernice were residents of California, they filed a joint income tax return for 1950. The decree of divorce obtained by Lucille could not become final until at least a year after its date.

The law of California is that a marriage can be dissolved only by death of one of the parties or by the final judgment of a court of competent jurisdiction.[11] A subsequent marriage contracted by any person during the life of a former husband or wife is illegal and void unless the former marriage has been dissolved or annulled.[12] In no case can a marriage of either of the parties during the life of the other be valid in California if contracted within one year after the entry of an interlocutory decree of divorce.[13] After the entry of an interlocutory decree, neither party can dismiss the divorce action without the consent of the other.[14] Only when one year has expired after the entry of an interlocutory judgment may the court enter the final judgment granting the divorce. Such a final judgment shall restore the parties to the status of single persons and permit either to marry after

7. Burnet v. Logan, 283 U.S. 404, 412, 51 S.Ct. 550, 552, 75 L.Ed. 1143.

8. "We think the taxpayer is entitled to a correct determination of his tax deficiency without regard to its immediate consequence, and that the failure of the Tax Court to determine a correct deficiency may be reviewed by this court on a petition for review." Keeler v. Commissioner of Internal Revenue, 10 Cir., 180 F.2d 707, 709.

9. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Lawrence v. Commissioner of Internal Revenue, 9

Cir., 143 F.2d 456; San Joaquin Brick Co. v. Commissioner of Internal Revenue, 9 Cir., 130 F.2d 220, 225.

10. Osenbach v. Commissioner of Internal Revenue, 4 Cir., 198 F.2d 235, 237.

11. California Civil Code, West Annotated Civil Code (1954) § 90.

12. California Civil Code, West Annotated Civil Code (1954) § 61.

13. California Civil Code, West Annotated Civil Code (1954) § 61, subd. 1.

14. California Civil Code, West Annotated Civil Code (1954) § 131.

the entry thereof.[15] It is further provided that a divorce obtained in another jurisdiction shall be of no force in California if both parties to the first marriage be domiciled in California at the time of the divorce.[16] These provisions are enforced by the courts of California with respect to property rights as well as other features.[17]

Albert Gersten calls attention to recent decisions of the California courts which hold that, as between the parties to a second marriage contracted before final judgment of divorce as to the first marriage, they are estopped to question the validity of the second marriage as between themselves.[18] We hold such decisions inapposite. The argument of Albert is pure sophistry. The bigamous marriage can be annulled, and the State of California can prosecute Albert for bigamy if Lucille should complain.[19]

 Albert Gersten, as a party to a bigamous marriage, has of his own choice placed himself in an ambiguous position. Both marriages cannot be used to lay foundations for income tax returns. Certain it is, Albert cannot file a joint income tax return with Bernice and then another with Lucille or vice versa. He must make a choice. He chose Bernice. The choice was wrong. The community rights of the former marriage are still in existence. It is not here decided that he has the right to file a joint income tax return with Lucille. By his own act, he may possibly have lost both rights. The invalid and illegal marriage, however, founds rights neither against the State of California nor against the United States. Upon this phase, the action of the Tax Court is approved.

Affirmed in part, remanded in part for further proceedings in accordance with this opinion.

---

15. California Civil Code, West Annotated Civil Code (1954) § 132.

16. California Civil Code, West Annotated Civil Code (1954) § 150.1.

17. "It is the final judgment that grants the divorce. The interlocutory judgment does not have that effect. * * * In the meantime the parties remain in the legal relation of husband and wife." In re Estate of Dargie, 162 Cal. 51, 53–54, 121 P. 320, 321; Brown v. Brown, 170 Cal. 1, 147 P. 1168; Paulus v. Bauder, 106 Cal.App.2d 589, 235 P.2d 422; In re Estate of Seiler, 164 Cal. 181, 128 P. 334.

18. "It is not the marriage which is found valid * * * Rather it is that defendant by reason of his conduct will not be permitted to question * * * the divorce." Spellens v. Spellens, 49 Cal.2d 210, 219–220, 317 P.2d 613, 619; Dietrich v. Dietrich, 41 Cal.2d 497, 261 P.2d 269, certiorari denied 346 U.S. 938, 74 S.Ct. 378, 98 L.Ed. 426.

19. "Every person having a husband or wife living, who marries any other person, except in the cases specified in the next section, is guilty of bigamy." California Penal Code, West Annotated Civil Codes (1954) § 281.