ESTATE of Herman BORAX, Deceased, Hermine H. Borax, Louis Borax and Benjamin Borax, Executors,

and

Hermine Borax, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 282, 283, Docket 29230, 29231.

United States Court of Appeals Second Circuit.

Argued Jan. 19, 1965.

Decided July 30, 1965.

Friendly, Circuit Judge, dissented.

Julius G. Hirsch, New York City (Stuart M. Berkman, New York City, of counsel), for petitioners.

Norman H. Wolfe, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Robert N. Anderson, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This case arises from the fact that Congress, as it often must, has relied on nonfederal bodies of law to give content to primary legal concepts, such as marriage and divorce, that are employed in the federal tax scheme.

Herman and Ruth Borax were married in New York City in 1935. They lived there and had one son. By 1946 the marriage floundered. On March 14, 1946 they separated by mutual consent, and executed a separation agreement, which, among other things, gave Ruth custody of their son and obliged Herman to pay $575 a month for the support of Ruth and the child. These payments, amounting to $6,900 per year, were increased to $8,550 per year by a consent decree, which reformed the separation agreement and was entered by the Supreme Court of New York on November 22, 1946. Herman faithfully discharged this obligation throughout his lifetime.

On August 7, 1952, some six years after the separation a divorce decree was entered by a civil court in the State of Chihuahua, Mexico. The decree recited that the proceedings were instituted by Herman Borax against Ruth Borax, giving as grounds for the divorce "the incompatibility of characters"; that Herman had "personally appeared in this Court on the 26th. of June last" and had "submitted a certificate of residence of this City"; and that Ruth was served on July 10 "by the corresponding authority of New York, New York, as is of record," but that "she did not appear to answer the complaint." The Court noted that it was "competent to hear and pass on the present case according to Article 23 of the Law of Divorce [of the State of Chihuahua], in view of the fact that the plaintiff submitted to this jurisdiction"; and it concluded that "plaintiff proved his action" because of the failure of the defendant, Ruth, to appear and to answer the complaint. The marriage was declared dissolved.

To no one's surprise, several weeks later Herman Borax remarried, this time to Hermine. There were two wedding ceremonies: the first occurred on August 21, 1952 in Juarez, Mexico, where the divorce proceedings were instituted, and the second took place in New Haven, Connecticut on August 29, 1952. Herman and Hermine Borax thereafter lived together in New York City. Herman died in 1961.

Soon after the divorce and remarriage, the first wife, Ruth, commenced declaratory proceedings in the Supreme Court of New York, New York County. She attacked the validity of the divorce and the second marriage, and sought a judicial declaration that she was still Herman's lawful wife. The court had personal jurisdiction over Herman and Hermine; they were personally served and actively participated in the suit with the assistance of counsel. In accordance with its opinion, 119 N.Y.S.2d 819, which merely commented that Ruth "was not served and did not appear in that action," the Court entered an order on February 3, 1953 declaring that Ruth "is the lawful wife of" Herman, that Herman and Hermine "are not husband and wife," and that "the decree of divorce" obtained by Herman "is invalid, and of no force or effect in law."

As though this human situation was not complicated enough, with a Mexican court and New York court taking different views as to who was Herman's wife, the Commissioner of Internal Revenue stepped into the picture, asserting deficiencies for the years 1952 through 1955 and 1957. During each of these years Herman and Hermine filed joint returns and claimed a deduction for the payments Herman had made to Ruth under the 1946

separation agreement and claimed dependency exemption for Hermine's parents and her children by a prior marriage. The Commissioner took the position that Herman and Hermine were not husband and wife; that they were not entitled to file a joint return; that Herman was not entitled to claim Hermine's children or parents as his dependents; and that the payments to Ruth were not deductible to Herman. Herman[1] and Hermine petitioned the Tax Court for a redetermination of the deficiency, asserted by the Commissioner for those years, but the Tax Court sustained the Commissioner's position,[2] 40 T.C. 1001 (1964). Pursuant to sections 7482, 7483 of the 1954 Code, taxpayers filed petitions to review this decision, and we reverse.

## I. The Support Payments

Under section 23(u)[3] of the 1939 Code, and its counterpart in the 1954 Code, section 215,[4] the payments made by Herman to Ruth under the 1946 separation agreement are deductible to Herman if they are includible in Ruth's gross income according to section 22(k)[5] of the 1939 Code or section 71[6] of the 1954 Code. In terms of the present case, where the separation agreement was executed prior to the enactment of the 1954 Code, and there is no decree of separate maintenance,[7] these payments are in-

---

1. Soon after filing the petition in the Tax Court, Herman died, and his executors have been substituted as parties in his stead. For simplicity, references shall be made herein to Herman rather than his executors.

2. The Commissioner has taken the position that if the payments are held deductible to Herman, then, of necessity they must be includible in the gross income of Ruth. Deficiencies were asserted against Ruth for she failed to include these amounts in her gross income, or for that matter to file any returns for the years in question. To preserve his rights on this alternative position, the Commissioner has filed a petition for review of the Tax Court decision which was in favor of Ruth. The Commissioner moved that this petition be held in abeyance pending a final decision on the petition for review filed by Herman's estate and Hermine; Ruth approved of this procedure; and this Court granted the Commissioner's motion.

3. "*Alimony, Etc., Payments.*—In the case of a husband described in section 22(k), amounts includible under section 22(k) in the gross income of his wife, payment of which is made within the husband's taxable year."

4. "Alimony, Etc., Payments.
"(a) *General Rule.*—In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year."

5. "Alimony, Etc. Income.—In the case of a wife who is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, periodic payments (whether or not made at regular intervals) received subsequent to such decree in discharge of, or attributable to property transferred (in trust or otherwise) in discharge of, a legal obligation which, because of the marital or family relationship, is imposed upon or incurred by such husband under such decree or under a written instrument incident to such divorce or separation shall be includible in the gross income of such wife, and such amounts received as are attributable to property so transferred shall not be includible in the gross income of such husband."

6. "Alimony And Separate Maintenance Payments.
"(a) General Rule.—
"(1) *Decree of divorce or separate maintenance.*—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation."

7. Herman had taken a deduction for the support payments for the years 1949 and 1950 under the theory that the 1946 New York decree reforming the separation agreement sanctioned the separation and was therefore in effect a decree of separate maintenance for the purpose of section 22(k) of the 1939 Code. This position was rejected by the Tax Court, 30 T.C. 817 (1958).

cludible in Ruth's gross income, and hence deductible by Herman if: (1) Ruth and Herman were divorced under a decree of divorce; (2) the payments were made in discharge of a legal obligation imposed upon or incurred by Herman under such decree or under a written instrument "incident to such divorce"; and (3) the payments were periodic and received subsequent to the divorce decree.

▇▇▇▇ (1) We hold, for purposes of these provisions of the federal tax statute, and within the meaning of these provisions, that for the years in dispute Ruth and Herman were divorced under a decree of divorce. The subsequent declaration of invalidity by a jurisdiction other than the one that decreed the divorce is of no consequence under these provisions of the tax law.

This rule of validation tends to promote some measure of certainty and uniformity—important goals of the federal tax scheme; see Commissioner v. Lester, 366 U.S. 299, 301, 81 S.Ct. 1343, 1345, 6 L.Ed.2d 306 (1961), declaring "that it was the intention of Congress, in enacting § 22(k) and § 23(u)[5]of the [1939] Code, to eliminate the uncertain and inconsistent tax consequences resulting from the many variations in state law." Where, as here, the divorcing jurisdiction is not one of the States of the Union, and the decree has only the benefit of comity rather than the Full Faith and Credit Clause of the Constitution, the States are free to take different views as to the validity of the divorce. The possibility of disparity even exists if the divorcing jurisdiction is within the Union. For under the existing pattern of law, a divorce decree is not entitled to full faith and credit unless the rendering state has jurisdiction, and the rendering state's finding of jurisdiction is not itself entitled to full faith and credit. Although federal standards will be applied to determine if there is jurisdiction for full-faith-and-credit purposes, Williams v. State of North Carolina (II), 325 U.S. 226, 231 n. 7, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) (domicile), the Supreme Court is not in a position to resolve all such sister-state conflicts, see, e. g., Colby v. Colby, 78 Nev. 150, 369 P.2d 1019, cert. denied, 371 U.S. 888, 83 S.Ct. 186, 9 L.Ed.2d 122 (1962), and it would not be advisable for this court (or the Tax Court) to attempt such a resolution in these most collateral tax-deficiency proceedings. The rule of validation leaves the mobile spouse with the power to obtain a divorce in a jurisdiction whose decrees might not be recognized in every other jurisdiction. Yet by depriving the determination of invalidity of any federal tax significance the rule of validation avoids a measure of unevenness and uncertainty: all those taxpayers who have obtained a divorce in a particular jurisdiction are treated the same, regardless of whether the spouse against whom the decree has been obtained is able to, and does, invoke the power of another jurisdiction to declare that divorce invalid.

▇▇▇ This interest in uniformity might not by itself justify a rule of validation, but there is an additional factor. The rule tends to further the "indicated congressional policy of placing the tax burden of all general marriage settlement payments on the party entitled to their enjoyment," Lerner v. Commissioner, 195 F.2d 296, 298 (2 Cir. 1952), and it does so without interfering with any other congressional tax policy. The requirement that the marital relationship be dissolved by a judicial decree of divorce (or legal separation) as opposed to being dissolved by having the parties cease living together as husband and wife is not expressive of any significant policy. This was amply revealed in 1954 when Congress afforded the same tax treatment to support payments where the husband and wife are voluntarily separated and there is a written separation agreement. See generally Mavity v. Commissioner, 341 F.2d 865, 870 (2d Cir. 1965). If support payments are includible in the gross income of the wife and deductible by the husband when the parties are voluntarily separated, the same treatment should obtain when the husband and wife are "divorced" in the sense in which Ruth and Herman were divorced—they ceased liv-

ing together as husband and wife, they lived separately, and one party had obtained a decree dissolving the marital status, although the other had the decree declared "invalid" by a court of another jurisdiction.

This particular liberalization of the conditions under which support payments are includible in the gross income of the wife and deductible by the husband occurred in 1954, two years after the date of the Mexican decree. Yet it would be most undesirable to restrict the recognition of the Mexican divorce to the years following 1954; and those principles and aspects of the tax scheme, including the general income-splitting provisions for a husband and wife filing a joint return, that made it appropriate to charge the wife-recipient with the support payments and to allow a deduction for the husband-payor, were already in existence in 1952. Moreover, we do not regard the fact that this liberalization required that there exist a separation agreement executed after the enactment of the provision as removing one of the underpinnings of the rule of validation as applied in this case, involving a "divorce" that preceded that date. We understand this limitation to express a Congressional desire not to upset established pre-existing arrangements that most likely had taken possible tax effects into consideration in determining the size of the payments, see Mavity v. Commissioner, supra, 341 F.2d at 868. It did not reflect the judgment that voluntary separation formalized by an agreement executed prior to that date were not in principle entitled to the tax treatment afforded to voluntary separations formalized by an agreement executed after that date. Presumably the tax consequences of the 1952 Mexican divorce were not anticipated in the 1946 agreement.[8] But that would be true even if the Mexican divorce were left uncontested or declared valid in the subsequent New York declaratory proceeding. The

proper remedy would seem not to adjust the tax statutory concept of a divorce but to adjust the size of the payments, if need be, through state judicial proceedings.

■ The only circuit case law on point, Feinberg v. Commissioner, 198 F. 2d 260 (3 Cir. 1952), supports the rule of validation, and it is not without significance that this authority was established in 1952—at a time when the Mexican divorce was obtained and the New York declaratory proceedings were commenced, prior to the 1954 liberalization of the relevant deductibility provisions in the tax code, and far enough back to justify the accretion of reasonable expectations. The parties in Feinberg were married in New York in 1918 and continued to live there for the twenty years of their married life. In February 1940, after marital difficulties, they entered into a separation agreement; and in March of that year the husband instituted divorce proceedings in a Florida court. The wife did not appear, either in person or through counsel, and service was by publication only. In May the decree of divorce dissolving the marital relationship was obtained and in June the husband married again, this time in New Jersey. In 1941 the first wife commenced proceedings in New York, seeking in part a declaration that the Florida decree is invalid. A consent judgment was entered in November 1942 declaring the first wife to be the "true and lawful wife." The husband sought a contrary determination by raising the issue as a counterclaim in a subsequent action commenced by the wife the next year to enforce the separation agreement, but he failed. On these facts, the Third Circuit declared: "The mere fact that the marital domicile of the parties did not recognize the Florida divorce does' not render it a nullity for Federal income tax purposes." 198 F.2d at 263.

The court below sought to distinguish Feinberg on the ground that there the husband and the second wife were resid-

8. But it should be noted that in 1946, see supra p. 3094, Ruth sought a reformation of the separation agreement to provide her with funds "to take care of her

Federal and New York State income taxes" on the payments received under the agreement, see 30 T.C. 817, 818 (1958).

ing in New Jersey rather than New York when the New York court entered its consent judgment declaring the Florida divorce invalid. There is some doubt as to whether this was so, since the Tax Court opinion in Feinberg states that the husband was domiciled in New York until December 16, 1943, 16 T.C. 1485. In any event, the Third Circuit did not intend anything to turn on where the husband and the second wife were residing at the time of the declaration of invalidity of the divorce, nor should anything turn on it. If domicile and residence are to play any role in deciding whether the subsequent declaration of invalidity should be recognized, and we doubt whether they should, it would be the domicile of the first marriage and the domicile and residence of the first wife, the party seeking the declaration of invalidity, that would be relevant. And in both Feinberg and the instant case, save for the husband's journey to the divorcing jurisdiction, the husband and his first wife lived in New York during their entire married life together, and the first wife continued to live there after the divorce.

In concluding that Herman and Ruth were divorced for these tax purposes, notwithstanding the New York judgment declaring the Mexican divorce decree invalid, it is important to delineate two situations not before us.

First, we are not dealing with the situation where the rendering jurisdiction itself declares the divorce obtained invalid. See Estate of Daniel Buckley, 37 T.C. 664 (1962). To conceive that in such a situation the parties might not be considered divorced for these tax purposes is not irreconcilable with the position we take here, where a jurisdiction other than the one that granted the divorce declared it invalid. This distinction, which we do not pass on but merely declare to be possible, would not unfairly discriminate against the immobile wife receiving payments under a prior separation agreement who is interested in protecting herself against the unanticipated tax consequences of having to include the support payments within her gross income. If the husband refused to adjust the size of the payment accordingly, the immobile wife could commence, in the same jurisdiction that would be prepared to declare or had declared the divorce of another jurisdiction invalid, an action for the reformation of the separation agreement, and if need be, this reformation could be in the style of a *nunc pro tunc* order.

Secondly, we are not dealing with a situation where the rendering jurisdiction's concept of a divorce is totally alien to that contemplated by the tax laws. The test would not be whether the divorce would be declared invalid in every state, but rather whether the divorce frustrated the revenue purposes of the tax laws. We do not view the Mexican divorce Herman had obtained as failing this test, although it contains certain extreme elements, such as the ground of divorce ("incompatibility of character") and the apparent basis of the court's jurisdiction (the fact that the plaintiff had "submitted himself to the jurisdiction of the court" and that he resided in the jurisdiction long enough to obtain a certificate of residence). It would be most unfortunate if we were to interpret the concept of a divorce, as employed by these provisions of the tax law, to require something more than the incompatibility of character as a reason for dissolving the marital relationship. And it is difficult to understand why this concept of divorce would be inconsistent with lax jurisdictional standards, even if the defendant's connection with the rendering jurisdiction were so minimal as to raise doubts as to whether the assumption of personal jurisdiction would be consonant with due process of law (if the rendering jurisdiction were a State), and even if the requirement that one of the parties be a domiciliary of the rendering jurisdiction is dispensed with. New York, for example, regards the fact that a marriage took place in the state as a sufficient jurisdictional nexus, N. Y. Domestic Relations Law McKinney's Consol. Laws, c. 14, § 170; David-Zieseniss v. Zieseniss, 205 Misc. 836, 129 N.Y.S.2d

649 (Sup.Ct.1954), and a few states have considered residence alone to be sufficient, Note, Divisible Divorce, 76 Harv. L.Rev. 1233, 1248, n. 99 (1963) citing the state statutes. See generally, Alton v. Alton, 207 F.2d 667 (3 Cir. 1953), vacated as moot, 347 U.S. 610, 74 S.Ct. 736, 98 L.Ed. 987 (1954); Rosenstiel v. Rosenstiel, 16 N.Y.2d 64, 262 N.Y.S.2d 86, 209 N.E.2d 709 (1965). An interpretation of the concept of divorce that is expansive enough to accommodate these differences is certainly consistent with the revenue purposes of these provisions of the tax law. We make no pretense of deciding which decrees called a "divorce" would not be consistent with these purposes.

■ (2) We also find the second condition of deductibility set out above to be satisfied. Specifically, we hold that the payments were made in discharge of a legal obligation incurred by Herman under a written instrument (the 1946 separation agreement) and that this written instrument was incident to the 1952 Mexican divorce.

Paragraph 4 [9] of the separation agreement provided that Herman's obligation to make the support payments to Ruth were to continue "so long as the marriage of the parties * * * shall not be dissolved by any order, judgment or decree entered against" Ruth. We do not, however, interpret this provision to mean that Herman's legal obligation to make the payments to Ruth was terminated when he obtained the Mexican divorce. If this provision were to be given its most literal effect, it would conflict with the next following paragraph [10] which provides that the "foregoing payments" are in full satisfaction and discharge of any alimony Ruth may claim in any action by either party. Confronted with this inconsistency it is entirely appropriate to give the quoted language of paragraph 4 less than its most literal effect. The termination provision appears to have a punitive purpose and should be confined to divorce in which a court, having *in personam* jurisdiction over Ruth, found her guilty of misconduct. The Mexican divorce obtained by Herman does not fit that description. It would make little sense for Ruth to agree to a provision which allows Herman to terminate his obligation to support her by obtaining an *ex parte* divorce granted on the ground of incompatibility of character and which made no explicit provision of its own for alimony. Neither party understood Herman's support obligation under the agreement to have come to the end after the Mexican decree, and it makes little difference whether that understanding was derived from their intent to exclude such *ex parte* divorces from the scope of the termination provision or from the subsequent judgment of a New York court declaring the decree invalid. There would be no inconsistency between, in one sense, denying recognition to a subsequent declaration of invalidity for purposes of deciding whether the parties were divorced within the tax law and, in another sense, granting recognition to that declaration of invalidity for purposes of deciding whether Herman's obligations under the separation agreement have been terminated.

9. "4. That, while both parties hereto shall remain alive, and so long as the Second Party shall fully keep, observe and perform the terms, provisions, covenants and conditions hereof to be kept, observed and performed by her, and so long as the marriage of the parties hereto shall not be dissolved by any order, judgment or decree entered against the Second Party, the First Party shall pay to the Second Party, as hereinbefore provided, the sum of Five hundred and seventy-five ($575) Dollars per month, on the 15th day of each and every month, beginning with the month of March, 1946, as full, fair and reasonable provision for the Second Party and for the maintenance, education and support of said child, except as aforementioned. * * *"

10. "5. That the foregoing payments shall be in full satisfaction and discharge of any and all alimony, whether permanent or temporary, which the Second Party may claim, or be awarded, in any action that may hereafter be brought by either party against the other."

We also find, as odd as it may seem on first blush, that the 1946 separation was incident to the divorce decreed in 1952. The term "divorce" in this phrase "incident to such divorce" has been interpreted to refer to the status of divorce rather than the decree of divorce, Newton v. Pedrick, 212 F.2d 357, 361 (2 Cir. 1954) and thus it is of no consequence that the Mexican decree did not refer to the separation agreement except in connection with custody.[11] Nor does the fact that the separation agreement had been executed at a time when presumably the parties were not contemplating divorce bar a finding that the agreement was incident to the divorce eventually obtained.

In Commissioner v. Moses, 214 F.2d 912, 913–914 (2 Cir. 1954), cert. denied, 348 U.S. 913, 75 S.Ct. 293, 99 L.Ed. 716 (1955), this Court noted that the wife was "adamant" against divorce and that she did not agree to the separation agreement "in contemplation of any divorce." Yet we held that there was sufficient "nexus" between the divorce and the agreement, quoting language of Lerner (195 F.2d at 298) that "where the payments obviously take the place of alimony and otherwise satisfy the stringent requirements of I.R.C. § 22(k), although not formally incorporated into the decree, they should not be denied effect under the statute merely because there is no evidence that divorce and settlement were not contemporaneously planned and carried out." A further step was taken in Holt v. Commissioner, 226 F.2d 757, 758 (2 Cir.), cert. denied, 350 U.S. 982, 76 S.Ct. 468, 100 L.Ed. 850 (1955), where the wife was so "adamant" against divorce, that, unlike the wife in Moses, she refused "to include in the agreement any reference to a possible divorce or a clause relative to the incorporation of the terms of the agreement in any decree of divorce." This Court nevertheless held that the parties' intent was "immaterial" and that the written separation agreement is incident to the divorce because the "legal obligation to support survives the dissolution of the marital relationship."

In Holt and Moses the span of time between the execution of the separation agreement and the decree of divorce was substantially less than the six years present in the instant case. However, if, as Holt and Moses decide, there is no requirement that the parties contemplate, intend or plan a divorce at the time of entering the separation agreement there is no reason for making the lapse of time determinative. Moreover, even if Moses be read to require "that the possibility of a divorce [be] realized" by the wife when she executed the separation agreement, 214 F.2d at 914, a requirement that seems to serve no statutory purpose, the paragraph in the 1946 agreement providing that the "foregoing payments" are in full satisfaction of any *alimony* Ruth may claim in any action by either against the other is evidence of such a realization. Finally, in our case, unlike Holt and Moses, the separation agreement contained a terminating provision conditioned upon a divorce decree against Ruth. Yet we interpreted that provision not to be operative upon obtaining the divorce Herman had in fact obtained, and thus, as in Holt and Moses, the legal obligation incurred by Herman under the 1946 agreement to support survived the 1952 divorce. These decisions holding that a separation agreement is incident to a divorce if the obligation for support imposed by that agreement survives a divorce do not put a judicial gloss on the statutory phrase "incident to." They merely conceive of the required nexus in functional rather than causal terms: the agreement is incident to the divorce because the payments required under that

11. "Third.—It having been stated in the complaint that there is one son of the marriage, named James Stephen Borax who is with its mother, and according to the opinion of the Agent for the State's Attorney's Office, said son shall remain under the same condition as he now is in, and since there exists an agreement of separation signed by and between the parties, this sentence shall not alter such particulars."

agreement serve the same function as judicially decreed alimony.

(3) There can be no doubt that the payments are periodic within the meaning of the statute and that the payments for the years 1953–1955, and 1957 were subsequent to the alleged divorce. But it is not clear from the stipulation of the parties or the record before us whether all the payments received in 1952 were received subsequent to August 7 of that year, the date upon which the Mexican decree of divorce was entered. Of course, even if it is determined that the payments were not all received subsequent to date, an apportionment for 1952 may not be required; arguably the statute could be interpreted to mean that *all* payments received in the same year as in which the divorce is obtained can be deemed to be received after the decree for purposes of includibility in the gross income of the wife and the deductibility for the husband for that year. (Compare § 143, § 153, § 6013 of the 1954 Code, providing, in another context, that for taxpayers having the same taxable year, the marital status shall be determined at the close of the taxable year.) We need not reach that question, however, for we understand the Commissioner, through his silence on this point, to concede that all the payments received in 1952 were received subsequent to August 7 of that year.

## II. The Joint Returns and Dependency Exemptions

Section 51(b) of the 1939 Code, and its counterpart in the 1954 Code, section 6013, allow a husband and wife to file a single return jointly, and provide that the marital status shall be determined at the close of their taxable year if both have the same taxable year. Herman and Hermine filed joint returns for the years 1952 through 1955 and 1957, and we hold that the marriage performed in Mexico and Connecticut in 1952 following Herman's divorce from Ruth entitled them to the benefit of these sections for those years.

The Commissioner insists that for purposes of filing joint returns marital status must be determined in accordance with the law of the state of domicile, and that Herman and Hermine were not entitled to file a joint return because a court in the state of their domicile for the years in dispute, New York, had declared them not to be husband and wife. While there is much to be said against a rule resolving all conflicts in marital status in terms of the domicile of the parties, since it would attach important tax consequences to changing a home from state to state, and although the Commissioner has on occasion taken a contrary position, see Rev.Rul. 58–66, 1958 1–2 Cum. Bull. 60 (common law marriages), we do not pass on that broader issue here. The New York declaration of invalidity of the marriage between Herman and Hermine was predicated solely on the view that the Mexican divorce by Herman and Ruth was invalid; and it would make little sense for us to recognize the Mexican divorce for the purposes we did, and at the same time recognize a judgment which was predicated on a refusal to recognize that divorce. Cf. S.Rep. No. 1013, 80th Cong., 2d Sess. [1948], 2 U.S.Code Cong. & Ad.News, p. 1212, declaring that "a uniform construction" of all the provisions dealing with the determination of marital status, including those related to joint returns and "alimony and like payments," is intended.

Gersten v. Commissioner, 267 F.2d 195, 199–200 (9 Cir. 1959), relied upon so heavily by the Commissioner, did not involve a state court judgment declaring the second marriage invalid because of the invalidity of the divorce from the first marriage. Instead, it involved a state prohibition against remarrying that operated independently of whether the divorce obtained in a foreign jurisdiction was valid. The first wife had obtained an interlocutory decree of divorce in California some seven months before the husband obtained a Mexican divorce and remarried there, and the Ninth Circuit held the second marriage invalid for tax purposes because California was the state of domicile of all the parties and because it read California law to provide that "in

no case can a marriage of either of the parties during the life of the other be valid in California if contracted within one year after the entry of an interlocutory decree of divorce." In contrast, in the instant case the claimed invalidity of the second marriage is entirely derived from the invalidity of the divorce of the first marriage. We found it consonant with the tax purposes to recognize this divorce, and hence the underpinnings of not recognizing the second marriage are removed.

Similarly, for purposes of determining whether under section 25 of the 1939 Code and section 152 of the 1954 Code Herman and Hermine were entitled to take dependency exemptions on their joint returns for Hermine's parents and her minor children of a former marriage, we also hold that they were married.

Reversed.

FRIENDLY, Circuit Judge (dissenting):

Although, as was said of another ruling as to divorce, "I do not suppose that civilization will come to an end whichever way this case is decided," Haddock v. Haddock, 201 U.S. 562, 628, 26 S.Ct. 525, 551, 50 L.Ed. 867 (1906) (Mr. Justive Holmes dissenting), I cannot subscribe to my brothers' disposition of this appeal.

I agree Congress did not intend that the Commissioner in making tax determinations revolving around marital status, or the courts in passing upon them, should set themselves up as domestic relations tribunals. Hence I would join with the majority if the Mexican divorce stood unimpeached, even though we would have every reason to believe a New York court would have annulled it at Ruth's request, since New York regards such an ex parte Mexican decree as "a clear legal nullity * * * and of no more validity than a so-called mail-order divorce," Rosenbaum v. Rosenbaum, 309 N.Y. 371,

376, 130 N.E.2d 902, 904, 54 A.L.R.2d 1232 (1955).[1] But here we need not speculate whether Ruth would accept the divorcee status Herman sought to thrust upon her or what a New York court would do if she didn't. New York, the state where Herman and Ruth had lived and Herman and Hermine were living, through a court having personal jurisdiction over all persons in this triangle, adjudged at Ruth's instance that the ex parte Mexican decree "is invalid, and of no force or effect in law," that Ruth was Herman's lawful wife, and that Herman and Hermine "are not husband and wife." See Borax v. Borax, 119 N.Y.S.2d 819 (Sup.Ct.1953).

Under the Constitution that judgment not only is binding in New York but is entitled to recognition in every state, as indeed it would be if the challenged divorce had been granted by a sister state. Sutton v. Leib, 342 U.S. 402, 407–409, 72 S.Ct. 398, 96 L.Ed. 448 (1952). By statute, 28 U.S.C. § 1738, coming down from the first Congress, 1 Stat. 122 (1790), it is entitled to full faith and credit "in every court within the United States." I find no basis for believing that when Congress spoke of a wife who is "divorced," 1939 I.R.C. § 22(k), 1954 I.R.C. § 71(a) (1), it meant a wife who had been pronounced to be so by a piece of paper which has been drained of all legal vitality and no court in the land may lawfully respect in a suit between the parties most concerned. I am equally unable to understand how, under modern developments in the law of collateral estoppel, Herman and Hermine can challenge, as against the Commissioner, a proposition which, after full opportunity, they unsuccessfully challenged against Ruth, see Kurlan v. C. I. R., 343 F.2d 625, 628 n. 1 (2 Cir. 1965), and authorities there cited—especially when one result of a successful challenge should be a tax against Ruth on the amounts sought as a deduction by Herman. Yet as to this

---

1. Nothing to the contrary was held in the recent cases of Rosenstiel v. Rosenstiel, 16 N.Y.2d 64, 262 N.Y.S.2d 86, 209 N.E.2d 709 (1965), and Wood v.

Wood, 16 N.Y.2d 64, 262 N.Y.S.2d 86, 209 N.E.2d 709 (1965), decided since this appeal was argued.

last, I cannot see how when the Commissioner, confronted with my brothers' decision, presses his protective petition to review the Tax Court decision annulling the determination of a deficiency against Ruth, we could overcome her reliance on the New York judgment consistently with 28 U.S.C. § 1738, save by giving the language of the Revenue Codes a construction which, as indicated, I think indefensible. If that be so, it sufficiently indicates the error in the decision here.

I recognize that my view puts me in conflict with Feinberg v. C. I. R., 198 F. 2d 260 (3 Cir. 1952), since I join my brothers in finding the Commissioner's distinctions of that case insubstantial. But my regret in having to part company with another court of appeals is lessened by my inability to follow the majority's distinction of Gersten v. C. I. R., 267 F.2d 195, 199–200 (9 Cir. 1959). The two decisions seem basically inconsistent; indeed, Feinberg, where a judgment had decreed the divorce to be invalid, was in some ways a stronger case for the Commissioner than Gersten. We thus cannot avoid conflict with another circuit, however we decide this case.

I would affirm.