The **PRUDENTIAL INSURANCE COMPANY OF AMERICA, a corporation,** Plaintiff,

v.

**Patricia Ruth LEWIS et al., Defendants.**

**Civ. A. No. 68-55.**

United States District Court
N. D. Alabama, S. D.

July 28, 1969.

---

Ralph B. Tate and the firm of Spain, Gillon, Riley, Tate & Ansley, Birmingham, Ala., for plaintiff.

Robert Russell Bryan, Lindbergh, Lindbergh, Leach & Bryan, and William H. Ellis and Albert Boutwell, Birmingham, Ala., for defendants.

GROOMS, District Judge.

## OPINION IN LIEU OF FORMAL FINDINGS

This is an interpleader action of which the Court has jurisdiction under Title 28 U.S.C.A. § 1335, and involves the conflicting claims of the purported widow of the insured, Arthur Lee Lewis, and of his heirs at law.

Lewis was a native of Alabama but was a sergeant in the United States Army stationed at Holloman Air Force Base in the State of New Mexico. He had been so stationed for some time prior to his sudden death on March 18, 1967. His death resulted from injuries received in an automobile accident occurring in that state.

Patricia Ruth Lewis, a native of Arkansas, who resided in El Paso, Texas, had married Cruz Herrera Duran, a native of New Mexico, who was also a resident of El Paso. This marriage took place on February 6, 1960, in the City of Juarez, Chihuahua, Mexico. Neither of the Durans ever resided in Mexico.

In 1965 Mrs. Duran, whose maiden name was Bowman, and Lewis became acquainted and began to see each other. The Durans decided upon a divorce. On October 27, 1965, Duran went to Juarez, employed counsel and filed suit for divorce. The decree recites that the Durans had established a home in Fabens, Texas, that Mrs. Duran had left her home there after an argument, that her whereabouts was unknown, and that he prayed for summons by publication. The divorce proceedings were held in abeyance, apparently because the lawyer had not been paid his entire fee.

On February 19, 1967, Mrs. Duran, having decided to contract marriage with Sgt. Lewis, decided that she would check on the status of the divorce proceedings. She went to see a lawyer in Juarez [1]. Upon inquiry she learned, or at least she understood, from the lawyer that the divorce had been granted. She and Sgt. Lewis decided forthwith to get married. They applied for a license in El Paso, but were refused a license because she was white and he was a Negro. They then went across the Rio Grande to Juarez, obtained a license, and were "married" on the last mentioned date in a formal ceremony by a Justice of the Peace.

Two or three days after the ceremony, Mrs. Duran, now Mrs. Lewis as she assumed, met Mr. Duran, and he told her that the divorce was "no good." Whereupon she returned to Juarez and went to see the lawyer who had filed the bill, to make inquiry as to Mr. Duran's claim. The lawyer told her that the divorce had not been granted and that additional money would be required, presumably for his fee. Mrs. Duran then returned to El Paso and obtained the required sum. This was delivered to the lawyer on the 23rd day of February 1967. At the same time she signed an answer, confessed the ground of incompatibility, and submitted herself to the jurisdiction of the court. She did not appear personally before the court, although the decree recites that she did so appear. The decree was formulated and signed on March 24, and filed on March 25, 1967.

Mrs. Lewis returned to her rooming house in El Paso after the ceremonial marriage. Lewis would visit her there on the weekends, and on most of the

---

1. Whether it was the lawyer who filed the proceedings or another is not certain.

weekends she would accompany him back to Holloman and would spend a night or so with him in his private living quarters in the barracks. Just a few days before the accident Lewis applied for separate living quarters for himself and his new wife. From the 19th of February until his death she used his credit card, and signed her name "Mrs. Arthur Lewis." He introduced her as his wife and made a number of other declarations to that effect, and received congratulations on their marriage. Witness John C. Givens, a Southern Pacific porter, at whose home in El Paso Mrs. Lewis stayed while caring for his aged mother while he was away from home, testified that they held themselves out as man and wife. He had known them over a period of six months.

On February 10, 1967, Lewis wrote Mrs. Duran, while she was supposedly in Ft. Smith, Arkansas, pleading with her to "please come back so we can get married * * *" The marriage ceremony in Juarez followed soon after this entreaty. After he had been mortally injured and shortly before he expired Lewis inquired as to the safety of "my wife." Mrs. Lewis was driving the vehicle at the time of the accident.

Mrs. Lewis received Sgt. Lewis's last pay check. The certificate of death filled out by a Justice of the Peace states that Patricia Lewis is the "wife" of the decedent.

Sgt. Lewis left surviving him six brothers and five sisters, and eight nephews and nieces, the children of two deceased brothers. All of these relatives are parties hereto.

The policy of insurance is in the amount of $10,000.00. The certificate executed on December 7, 1965, under provisions of Public Law 89–214 recites under b. thereof as follows:

"Beneficiary and Payment Designation. The law provides that where no beneficiary is designated, that beneficiary entitlements devolve to wife, children, and parents in that order. My desires are:

X Have beneficiary devolve under provisions of law.

_____The beneficiary(ies) which I designate are: (Where more than one beneficiary is designated, the percentage each is to receive is also required)

_____ "

Since the marraige ceremony of February 19, 1967, preceded the divorce decree it is not contended that that marriage was valid, but Mrs. Lewis contends that the Mexican divorce is a valid divorce, and that there was a valid common-law marriage under the laws of Texas and that therefore she is the lawful widow of the insured. The heirs dispute both claims.

### VALIDITY OF THE MEXICAN DIVORCE

■ A decree which is void for want of jurisdiction is generally subject to collateral attack. 24 Am.Jur.2d Divorce and Separation § 478 at 602; Ingram v. Ingram, 143 Ala. 129, 42 So. 24.

■ The full faith and credit clause (Sec. 1, Art. 4) of the Constitution does not apply to a divorce obtained in a foreign country. 24 Am.Jur.2d Divorce and Separation § 964 at 1098. When such a decree is recognized it is by virtue of comity. *Id.*

■■ The fact of domicile is a question to be determined by the *lex fori.* 15A C.J.S. Conflict of Laws § 9 at 422. The domicile being determined, the *lex domicilii* generally governs all questions of personal status such as the right to a divorce. *Id.,* § 10 at 426. Since the Durans were domiciled in Texas, the law of that state would determine the validity of a divorce obtained by its domiciliaries in Mexico. However, comity is a matter for the courts of the jurisdiction in which recognition of a decree of a foreign country is sought. 27B C.J.S.

Divorce § 329 at 791, Note 47 [2]. Accordingly, this Court will look first to the Alabama decisions. The courts of Texas and Alabama are in accord and, as will presently appear from the authorities cited, whether the validity of the divorce is tested by the Alabama decisions or by those of Texas, the end result will be the same.

██ ██ It is a general rule that the courts will not recognize a divorce obtained in a foreign country if neither of the parties was domiciled in that country, primarily for the reason that the foreign court does not have jurisdiction of the marital status of the persons involved, which is a jurisdiction separate and distinct from jurisdiction over the persons themselves. The rule that a domicile of at least one of the parties is essential applies, even though a domicile is not required by the law of the jurisdiction granting the divorce. 22 Am.Jur.2d § 965 at 1101. This is the law in Alabama as well as in Texas and New Mexico. Wells v. Wells, 230 Ala. 430, 161 So. 794; In re Keen's Estate, 77 S.W.2d 588 (Tex.Civ.App.); Richmond v. Sangster, 217 S.W. 723 (Tex.Civ.App.); and Golden v. Golden, 41 N.M. 356, 68 P.2d 928.

In the *Wells* case the court stated:

"We note that the proceedings in the Mexico court do not recite that Mr. Wells was a resident of that republic. But had it done so, *since that recital is of a fact essential to the jurisdiction of that court*, it may be contradicted in this suit to show that the decree there rendered was null and void." (Emphasis supplied.)

In *In re Keen's Estate* the court quoted in support of its decision the very succinct language employed by the court in German Savings & Loan Society v. Dormitzer, 192 U.S. 125, 24 S.Ct. 221, 48 L.Ed. 373, as follows:

"A decree of divorce may be impeached collaterally in the courts of another state by proof that the court granting it had no jurisdiction because of the *plaintiff's want of domicil, even when the record purports to show such jurisdiction and the appearance of the other party*." (Emphasis by Texas court.)

In *Golden*, the New Mexico Supreme Court, in holding a Mexican divorce invalid, said:

"The decree which the Mexican court undertook to grant in the case at bar is wholly invalid. There is no claim that either Golden or his wife ever resided for any length of time, or had their marital domicile, in Mexico. Every fact in the case shows that Golden had no intention at any time of residing in Mexico, notwithstanding he registered as a resident of the state."

In the early case of Thompson v. State, 28 Ala. 12, at 21, the court made the following pronouncement:

"If the defendant did not go to Arkansas *animo manendi*, or, if he went to that State merely for the purpose of obtaining a divorce, and intending to remain no longer than was necessary to accomplish his purpose, or, if the divorce was procured by fraud, the decree of the Arkansas court would be void, * * *." [3]

---

2. In Borax' Estate v. C.I.R., 349 F.2d 666, 2 Cir., it was stated:
"Where as here, the divorcing jurisdiction is not one of the States of the Union, and the decree has only the benefit of comity rather than the Full Faith and Credit Clause of the Constitution, the States are free to take different views as to the validity of the divorce. The possibility of disparity even exists if the divorcing jurisdiction is within the Union. * * * [T]he Supreme Court is not in a position to resolve all such sister-state conflicts, see, e. g., Colby v. Colby, 78 Nev. 150, 369 P.2d 1019, cert. denied, 371 U.S. 888, 83 S.Ct. 186, 9 L.Ed.2d 122 (1962)."

3. The principle was restated in Thompson v. Thompson, 91 Ala. 591, 8 So. 419, 11 L.R.A. 443.

Texas adheres to the same rule. See *Richmond, supra,* where it was stated:

"In line with the Illinois cases is Stuart v. Cole, 42 Tex.Civ.App. 478, 92 S.W. 1040; and the other Texas cases therein cited. The rule in such cases is that merely going to a state for the purpose of securing a divorce and residing there the required length of time, but without any intention of remaining there permanently or indefinitely, is not sufficient to give jurisdiction in divorce proceedings."

As to the New Mexico law the quotation from *Golden* will suffice.

The factor mentioned in *Thompson, Richmond,* and *Golden, supra,* is given great weight against recognition of a foreign divorce under the rule of comity, 24 Am.Jur.2d Divorce and Separation § 966 at 1102.

■ The rule of comity does not require the courts of Alabama to recognize as valid a divorce rendered by a foreign jurisdiction on a showing of jurisdiction which would not support a domestic judgment of the same character. Crimm v. Crimm, 211 Ala. 13, 99 So. 301.

Although involving residents of a sister state and an action for divorce in Alabama, the court in Jennings v. Jennings, 251 Ala. 73, 36 So.2d 236, 3 A.L.R. 2d 662, held that a domestic divorce could not be granted where both of the parties resided without the state.

In *Jennings* the court was called on to construe an enactment of the legislature purporting to give the courts jurisdiction in a divorce action "when the Court has jurisdiction of both parties to the cause of action." The court in the course of its opinion said:

"Has the court by virtue of the statute the power to render a decree of divorce when not only the respondent, but also the complainant resides in another state? We do not think so.

"Jurisdiction, which is the judicial power to grant a divorce, is founded on domicile under our system of law. * * * This is true because domicile

in the state gives the court jurisdiction of the marital status or the res which the court must have before it in order to act. * * * The domicile of one spouse, however, within the state gives power to that state to dissolve the marriage. Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273; neither party here is a resident of Alabama. Jurisdiction of the res is essential because the object of a divorce action is to sever the bonds of matrimony, and unless the marital status is before the court, the court cannot act on that status. Authorities supra. Furthermore it is recognized that unless one of the parties has a residence or domicile within the state, the parties cannot even by consent confer jurisdiction on the courts of that state to grant a divorce.

* * * * * *

"Before enactment of the statute, we said in Wilkes v. Wilkes, 245 Ala. 54, 16 So.2d 15, 16, that 'The courts of a state can have no jurisdiction over the marital status of persons, neither of whom is domiciled there' * * *.

"While we appreciate the need for comity between the states and feel that a state can have no legitimate concern with the matrimonial status of two persons who do not reside within its territory, why cannot the legislature make the enactment in which we are here concerned? To this we say that the legislature of a state cannot confer on the courts of that state a power which is not within the power of the state to confer on the legislature. 19 C.J. p. 26, 27 C.J.S., Divorce, § 71.

* * * * * *

"The court acted correctly in dismissing the bill of complaint in this case. It had the right to do this of its own motion because of lack of jurisdiction. Woolf v. McGaugh, 175 Ala. 299, 57 So. 754."

■ If Alabama would not recognize a domestic divorce such as that sought

in *Jennings*, it would certainly not recognize as valid the Mexican divorce here in issue, when the facts are undisputed that neither of the parties to that divorce was a resident of Mexico, and it is further undisputed that the parties went to Mexico for the purpose of obtaining the divorce and with no intention of residing there [4].

The Fordham Law Review, Vol. 33, p. 449, et seq., carries an extensive survey of the decisions involving the validity of Mexican divorces. It is noted that the so called bilateral decree [5] has been before the courts in New Jersey, New Mexico, New York and Ohio. New York is the only one of the four states in which such a decree has been sustained and therefore represents the minority view.[6]

## COMMON-LAW MARRIAGE

Although its decision is against the validity of the divorce, in view of the probability of error with respect to its ruling on that issue, the Court, having stated the facts, considers it the wiser course to render its decision with regard to the existence of a common-law marriage between the Lewises. The validity of a common-law marriage in this instance depends upon the validity of the divorce, since if either of the contracting parties had a legal spouse no such marriage could exist.

■ The same standard of competency is required in the case of a common-law marriage as in the case of a ceremonial marriage. 55 C.J.S. Marriage § 10 at 820 (and § 17, page 833, Note 44), citing among other cases as sustaining authority, Bell v. State, 137 Tex.Cr.R. 401, 129 S.W.2d 664, and Calhoun v. Dotson, 32 S.W.2d 656 (Tex.Civ.App.).

■ Assuming the validity of the divorce and further assuming that the Texas miscegenation laws, see Fraser v. State, 3 Tex.App. 263; Moore v. State, 7 Tex.App. 608; and Flores v. State, 60 Tex.Cr.R. 25, 129 S.W. 1111, are invalid as violative of the Federal Constitution, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, Mrs. Duran and Sgt. Lewis could validly enter into a common-law marriage in the State of Texas, since that state gives recognition to such marriages. 55 C.J.S. Marriage § 6 at 816, 817, Note 98. Based upon the same assumptions, the facts establish a common-law marriage under the Texas decisions, Middlebrook v. Wideman, 203 S.W.2d 686 (Tex.Civ.App.); and Drummond v. Benson, 133 S.W.2d 154 (Tex.Civ.App.), provided that it was entered into and consummated in Texas.

■ New Mexico does not recognize common-law marriages. Gabaldon v. Gabaldon, 38 N.M. 392, 34 P.2d 672, 94 A.L.R. 980. If the marriage was entered into and consummated in that state its validity could not be sustained. However, New Mexico will recognize a common-law marriage of the State of Texas. State v. Brem, 51 N.M. 63, 178 P.2d 582. For authorities generally which recognize the validity of common-law marriages contracted in other states, see 55 C.J.S. Marriage § 4 at 813, Note 66.

■ For the Texas law to govern the relationship, Mrs. Lewis must rebut the presumption that her domicile was that of her husband [7]. 28 C.J.S. Domicile § 12 at 24 and 37. See McGehee v. Boedeker, 200 S.W.2d 697 (Tex.Civ.App.).

■ Sgt. Lewis enlisted in the armed services while a resident and citizen of Alabama. There is no indication what-

---

4. See Appendix for Mrs. Lewis's testimony.

5. The case where both parties are before the court, or one party is physically present and the other appears by counsel.

6. See, also, 32 Fordham Law Review, p. 581, et seq., dealing principally with the New York decisions.

7. Justice Holmes in his dissenting opinion in Haddock v. Haddock, 201 U.S. 562, 26 S.Ct. 525, 50 L.Ed. 867, 895, referred to this principle of law as a fiction, saying, "Of course this is a pure fiction, and fiction always is a poor ground for changing substantial rights."

ever that he ever intended to become a resident of New Mexico. The Texas court has held that the mere fact that a party resided within the state under military orders is not sufficient to establish domicile within the state. There must be proof of intention to make a home within the state and such intention should be evidenced by overt acts sufficient to satisfy the court that a serviceman is in truth a bona fide resident. Struble v. Struble, 177 S.W.2d 279 (Tex.Civ.App.). New Mexico has held that there must be a clear manifestation of an intent of the serviceman to make his permanent residence within the state. Allen v. Allen, 52 N.M. 174, 194 P.2d 270. The fact that he rented an apartment for himself and his family as an incident to army life, and was said to have expressed a desire to go into business in the vicinity at some future time was not such a sufficiently clear manifestation of requisite intent. Allen v. Allen, supra.

■ The authorities generally agree that a person inducted into military service retains his domicile or residence in the state from which he entered the military service. See Annotation 21 A.L.R. 2d 1180. A number of Texas cases are cited in support of this general rule.

■ Mrs. Lewis had resided in El Paso some seven years prior to entering into the relationship with Sgt. Lewis. No incident of the "common-law" marriage occurred in Alabama [8]. There was no such residence of Sgt. Lewis within New Mexico as to bring into operation the "fiction" that Mrs. Lewis became a resident or acquired domicile in that state because Lewis was stationed there. The Court is of the opinion and so finds that if it be finally held that the Mexican divorce was valid, a common-law marriage was contracted in the State of Texas between Sergeant and Mrs. Lewis, that it was consummated there by cohabitation, and was in existence at the time of his death.

The heirs of law are entitled to a decree in their favor awarding them the funds paid into the Registry of the Court, less attorney's fees and costs.

Plaintiff is entitled to a reasonable attorney's fee for services rendered by its counsel in this action. The sum of $648.60 will be a reasonable fee for such services. It is also entitled to reimbursement of expenses incurred in the amount of $251.40 for court, Marshal's fees, and cost of publication.

## APPENDIX

*Testimony of Patricia Ruth Lewis*

" * * *

Q Did your husband, the one named Duran, live in Mexico?

A No, he did not.

Q Where did he live?

A To my knowledge, I don't know.

Q Where did you live when you were married?

A After our marriage, Favens, Texas.

* * * * * *

Q You say your husband Duran was a native of New Mexico or Mexico?

A New Mexico.

Q You were both American citizens?

A Yes.

* * * * * *

The Court: I notice this divorce bill was filed in 1965. Do you know anything about it being filed?

A Yes, sir, I do. I wanted it filed myself. I put a $25.00 deposit down on it.

The Court: When did you do that, in 1965?

A I put one deposit in 1963, I put a $10.00 deposit, then I dropped it.

The Court: The divorce was filed by your husband?

A Yes, sir.

* * * * * *

---

8. Common-law marriages are recognized in Alabama. Kelly v. Kelly, 247 Ala. 316, 24 So.2d 265.

Q You say you filed for the divorce or your husband did?

A I filed for one, and he said he had enough money to cover it if I didn't have the finances to do so. He said he would go ahead and get it and finance it.

\* \* \* \* \* \*

Mr. Duran didn't pay all the money, so I went and borrowed the money and paid the divorce off, but I had already signed it.

\* \* \* \* \* \*

The reason why the divorce did not come through, Mr. Duran owed some money on it, and I went over and paid the rest of the money he owed so it would be finalized.

\* \* \* \* \* \*

I met my ex-husband when I went to get my clothes to go to Holloman Air Force Base, I met my ex-husband, and my ex-husband told me I wasn't legally married to Mr. Lewis."