ESTATE OF THOMAS P. QUIRK, DECEASED, GREGORY J. QUIRK AND NORMAN D. ROLLINS, CO-ADMINISTRATORS, AND MARY C. QUIRK, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Quirk v. Commissioner
Docket Nos. 28148-82; 28149-82; 28681-82; 28682-82; 28683-82; 28710-82.
United States Tax Court
T.C. Memo 1988-286; 1988 Tax Ct. Memo LEXIS 315; 55 T.C.M. (CCH) 1188; T.C.M. (RIA) 88286; June 29, 1988; As amended July 6, 1988 Harvey S. Sander and Jerome R. Rosenberg, for the petitioners in docket Nos. 28148-82 and 28149-82. Eugene Chester and James H. Kenworthy, for the petitioners in docket Nos. 28681-82, 28683-82 and *318 28710-82. Donna I. Epstein, Kevin C. Reilly and Paulette Segal, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: These are consolidated cases for the redetermination of deficiencies in income taxes of the petitioners [2] arising out of the withdrawal of a partner from an engineering partnership. [3] The issues for decision involve the amount and character of distributions made to a withdrawing partner by a partnership in 1974 and 2975, in liquidation of his partnership interest, and the Federal income tax treatment of these distributions to the withdrawing partner and to the remaining partners. Specifically, 1) whether the withdrawing partner received a distribution under I.R.C. section 752[4] as a result of the retirement of his share of a partnership indebtedness by the partnership, and 2) the nature and treatment of this and the other distributions received under section 736, which will determine the withdrawing and remaining partner's Federal tax liability. *319 FINDINGS OF FACT Many of the facts and exhibits are stipulated and are incorporated herein by this reference. Petitioners, Thomas Quirk and Mary Quirk, filed a joint Federal income tax return for the year 1974 and separate Federal income tax returns for the taxable year 1975. Thomas P. Quirk resided in Nashville, Tennessee at the time of filing his petitions in docket Nos. 28148-82 and 28149-82. Petitioner, Mary C. Quirk, resided in Stamford, Connecticut at the time of filing her petition in docket No. 28148-82. Petitioners, John P. Lawler ("Lawler"), Felix E. Matusky ("Matusky"), Michael J. Skelly ("Skelly") and Karim A. Abood ("Abood") (hereinafter referred to sometimes as the "remaining partners"), each filed joint income tax returns with their respective spouses for the calendar years 1974 and/or 1975. All of the remaining partners resided in New York at the time their petitions were filed. Respondent is a stakeholder in this proceeding. Quirk was a partner in Quirk, Lawler and Matusky Engineers ("QLM"), [5] a New York State partnership formed in June 1965, until he withdrew as a partner on October 31, 1974. QLM was in the business of rendering professional engineering *320 services. QLM did not have a written partnership agreement at the time of forming their partnership, and no written partnership agreement was ever executed. QLM computed its income for Federal income tax purposes on the cash method of accounting and its taxable year was the calendar year. The partners of QLM shared profits and losses from January 1, 1974 through October 31, 1974 as follows: Quirk -- 30.667 percent, Lawler -- 30.667 percent, Matusky -- 30.667 percent, Skelly -- 8 percent. On October 31, 1974, Quirk withdrew as a partner from QLM. At the time of Quirk's withdrawal, QLM had no written agreement regarding the rights and obligations of the various partners upon the withdrawal of a partner from the partnership. After Quirk's withdrawal, the remaining partners continued in business as Lawler, Matusky and Skelly Engineers ("LMS") and shared profits and losses as follows: Lawler -- 38 percent, Matusky -- 31 percent, and Skelly -- 31 percent. On January 1, 1975, Karim Abood joined LMS. The partners in LMS shared profits and losses during calendar year 1975 as follows: Lawler -- 35 percent, Matusky *321 -- 28 percent, Skelly -- 28 percent and Abood -- 9 percent. Quirk, in his letter of resignation, noted that the remaining partners had elected to continue operations under a new partnership and that he agreed to assist "in effecting the transition." He agreed to be available over the next month to assist in any transitionary steps appropriate to the circumstance. Quirk did not share in any of the profits of LMS and LMS never lent him money. Following Quirk's withdrawal, Quirk and the remaining partners attempted to reach an agreement regarding Quirk's withdrawal but were unsuccessful in doing so. Nevertheless, at the request of all of the remaining partners and Quirk, and in anticipation of a withdrawal agreement that never materialized, Peat, Marwick, Mitchell & Co., ("Peat Marwick"), prepared financial statements on the accrual basis for QLM as of October 31, 1974, the date of Quirk's withdrawal, although the books of the partnership were maintained on the cash basis to facilitate preparation of income tax returns. Peat Marwick had been employed as QLM's auditors from 1971 on and had prepared financial statements for them for the calendar years 1971, 1972 and 1973 on on accrual *322 basis. Prior to Quirk's withdrawal, if a partner had any question or concern regarding his taxes or the partnership tax return he would have discussed the issues with someone from Peat Marwick. Each of the financial statements prepared by Peat Marwick in the past had been accepted by all of the partners. The financial statement of October 31, 1974, was prepared in conformity with generally accepted accounting principles applied on a consistent test basis and in Peat Marwick's opinion fairly represented the financial position of QLM as of October 31, 1974. The financial statement concluded that QLM's total assets as of October 31, 2974, were $ 1,790,644.05, including unrealized receivables of $ 1,609,906, cash and other current assets of $ 87,355 and capital assets net after depreciation and amortization of $ 101,283.17. Quirk's share of the partnership assets totalled $ 549,136 or 30.667 percent of $ 1,790,644. Since the unrealized receivables were 89.45989 percent of QLM's total assets as reflected in the financial statement, unrealized receivables of QLM represented 89.45989 percent of Quirk's proportionate share of the total assets. This amounted to 89.45989 percent of $ *323 549,136 or $ 490,257.16. The total liabilities of QLM as of October 31, 1974, as determined by Peat Marwick, amounted to $ 1,043,376.41, of which $ 650,000 consisted of a debt to Chemical Bank. Quirk's share of these liabilities amounted to $ 319,972, and was determined by applying his partnership percentage of 30.667 percent to the liabilities of $ 1,043,376.41 reflected on the financial statement as follows: Accounts payable &
accrued expenses
$ 305,006.57
Unearned income &
unlisted losses
(accounts payable
to clients)
28,227.36
Due to QLM Labs
60,142.48
Subtotal
$ 393,376.41
Notes payable to
Chemical Bank
650,000.00
Total Liabilities
$ 1,043,376.41
Quirk's partnership
Percentage share
30.667%
Quirk's share of
liabilities
$   319,972.00
The $ 650,000 partnership note payable to Chemical Bank reflected in the liabilities portion of the financial statement as prepared by Peat Marwick relates to a demand note payable by QLM and bearing interest at 1.25 percent above the prime rate. The QLM demand note payable to Chemical Bank was secured by the receivables of the partnership. *324 The note was subject to a security agreement which provided, in part, that: If undersigned Borrower is a partnership, the agreements herein contained shall remain in force and applicable, notwithstanding any changes in the individuals composing the partnership, and the term "Borrower" as used herein shall include any alternate or successive partnerships, but any predecessor partnerships and their partners shall not thereby be released from any liability. When Chemical Bank learned of Quirk's withdrawal from the partnership and of the formation of the LMS partnership, it demanded payment on the QLM note. LMS, thereafter, entered into a new loan agreement with Chemical Bank on December 10, 1975, as a result of which the balance of the QLM note was paid off. Pursuant to the QLM security agreement, Quirk remained liable for his share of the unpaid portion of the $ 650,000 note until the note was satisfied by LMS. In summary, the QLM note was satisfied with the payment of $ 50,000 prior to December 31, 1974, and payments and/or new LMS obligations totalling $ 600,000 during the calendar year 1975. Quirk is not a party nor an obligor-guarantor of the new LMS note to Chemical Bank. *325 Respondent and the remaining partners stipulated that the statement prepared by Peat Marwick correctly reflected the assets and liabilities of QLM as of October 31, 1974 and that the value of Quirk's interest in QLM amounted to $ 232,795, the amount of Quirk's capital shown in such statement. Quirk, however, believes that the fair market value of his partnership interest is greater than $ 232,795 and takes issue with many of the conclusions of the Peat Marwick financial statement. Quirk employed an accountant, Leon Radin ("Radin"), to review the October 31, 1974, financial statement. Radin took exception to certain computations in the statement, including the value of QLM's assets and the allowance for doubtful accounts. Specifically, Radin questioned why computer tapes he claims have value were omitted from the asset total. The remaining partners do not believe the tapes have any value. At the time of trial in this case, these disputes were part of a law suit instituted by Quirk against his former partners in 1977 in the Supreme Court of the State of New York, County of Rockland. [6]
*326 In 1974, the remaining partners distributed to Quirk $ 15,975 in cash, relieved Quirk of $ 120,636 of his obligations on various partnership liabilities other than the Chemical Bank loan and paid down $ 50,000 of the Chemical Bank loan (Quirk's share being $ 15,334). In 1975, the remaining partners paid Quirk $ 23,370 in cash, and retired the $ 600,000 balance on the note to Chemical Bank, Quirk's share being $ 184,002. The cash payments to Quirk ceased in April 1975, when it became evident that no withdrawal agreement would be reached. The partnership has not paid to Quirk the full amount of Quirk's proportionate interest in the partnership assets pending resolution of the State court litigation. In 1974 and 1975, the LMS partnership returns claimed deductions for guaranteed payments to Quirk of $ 119,089 and $ 184,998, respectively. LMS issued a Schedule K-1 to Quirk for each of the years 1974 and 1975 which reflected ordinary income that included the guaranteed payment deducted by the partnership. In 1974, Quirk reported income of $ 111,809 as his share of the partnership income from his interest in QLM. OPINION *327 Respondent's determination of the deficiency is presumptively correct. Welch v. Helvering,290 U.S. 111, 115 (1933). In order to overcome this presumption, petitioner must offer evidence that shows the determination is erroneous, Gersten v. Commissioner,267 F.2d 195, 199 (9th Cir. 1959), affd. in part 28 T.C. 756 (1957), and petitioner bears the burden of proof. Rule 142(a). At the outset, it must be noted that Quirk presented no evidence to controvert the figures contained in the Peat Marwick financial statements. No independent evaluation or financial statement prepared by qualified accountants was entered into evidence on behalf of Quirk, and no witnesses testified on behalf of Quirk as to an alternative valuation. While Leon Radin, a certified public accountant, testified on behalf of Quirk at trial that he took "exception" to certain conclusions drawn by the Peat Marwick auditors, these exceptions relate primarily to the state court controversy, currently in litigation in New York. At trial, all of the parties conceded that the decision of the state court was not necessary to resolve the tax issues presented before us. *328 It is now too late for Quirk to argue that the existence of an ongoing state court proceeding disputing the existence, value and character of certain partnership assets confirms the unreliability of the Peat Marwick report, which he believes is susceptible to attack. Where parties fail to agree as to the value of a retired partner's interest in partnership property, we will value the property based on a review of the facts and circumstances before us. [7] Based on a review of the uncontroverted evidence before us, we will adopt Peat Marwick's financial statement as the basis for our conclusions of the issues of this case. Peat Marwick had been QLM's accountants from 1971 through 1974, and prior to the instant controversy, Quirk took no issue with their tax conclusions on partnership matters. Moreover, the testimony of Michael Manus, a partner at Peat Marwick and a certified public accountant, confirmed to our satisfaction that the statements were prepared in a professional manner and in accordance with generally accepted accounting principles. Finally, and foremost, Quirk presented no *329 alternative financial statements for us to review, and accordingly, has not sustained his burden of proof with respect to the unreliability of the statements on which respondent bases his deficiencies. With this determined, we turn to the issues at hand. Quirk and the remaining partners disagree as to the character and treatment of the distributions. We will discuss each in turn. Section 736[8] applies to payments made to a "retiring partner" [9] by the partnership in liquidation of the partner's entire interest in the partnership, see section 1.736-1(a)(1)(i), Income Tax Regs., and provides the framework to determine the nature and character of such distributions. [10]
*330 Section 736 and the regulations thereunder state that payments made in liquidation of the entire interest of a retiring partner are considered as a distribution, and not as a distributive share or as a guaranteed payment, to the extent that the payments are made in exchange for the partner's entire interest in the partnership property, except unrealized receivables (and good will, not at issue here). See section 1.736-1(b)(1), Income Tax Regs.Section 1.736-1(a)(2), Income Tax Regs., specifically states that section 736 payments include items treated as distributions of money under section 752. [11]
Unrealized *331 receivables as defined by section 751(c), include any rights to payments for goods, which are not considered capital assets, or for services to the extent that the payments have not been taken into income by the taxpayer under his method of accounting. If the payments are made for unrealized receivables of the partnership, then they are taken into account in the income of the withdrawing partner as a distributive share under section 702 if they are determined with regard to the income of the partnership, or under section 61(a) as a guaranteed payment [12] if they are determined without regard to the income of the partnership. Section 736(a)(1), 736(a)(2); section 1.736-1(a)(3), Income Tax Regs. If a guaranteed payment is involved, the relevant amount would be deductible by the partnership if the requirements of section 162(a) have been satisfied. *332 If the payments are not made for partnership unrealized receivables, then the amounts are treated as made for the partner's interest in assets and as a distribution in complete liquidation under section 731. The remaining partners are not allowed any deduction for those payments since they represent either a distribution or a purchase of the withdrawing partner's capital interest by the partnership and the remaining partners. Sections 1.731-1(a)(1) and 1.736-1(a)(2), Income Tax Regs. The withdrawing partner does not recognize any gain except to the extent that any money distributed exceeds the adjusted basis of the partner's interest in the partnership. Section 731(a)(1). The gain to be recognized would be capital in nature. Section 1.731-1(a)(3), Income Tax Regs.
Section 1.736-1(a)(2), Income Tax Regs., provides that the distributions to a withdrawing partner must be allocated between section 736(a) and 736(b) payments. The regulations, *333 after requiring the above allocations, then discuss how the allocation should be made when the amount to be paid is a "fixed amount" or is not a fixed amount. We will address each of these. The parties stipulated that Quirk received distributions in liquidation in the following amounts from the partnership in 1974 and 1975: 1974
1975
Distribution resulting from
decrease in liabilities other
than note to Chemical Bank
$ 120,636
Cash Payments
15,975
$ 23,370
$ 136,611
$ 23,370
In addition to the stipulated distributions, the parties agree that Quirk received a distribution in liquidation of his partnership interest by virtue of his release from the Chemical Bank note in 1974 and 1975, but disagree over whether Quirk's release from the Chemical Bank debt by the partnership's payment of Quirk's share of the Chemical Bank note liability constituted a deemed distribution of cash to him for his interest in unrealized receivables or rather for his interest in other partnership assets. Respondent determined, and the remaining partners maintain, that the special rules under section 736(b)(2) are applicable to the distributions to Quirk to *334 the extent the partnership's assets consisted of unrealized receivables, 89.45989 percent according to the stipulation among the parties. Therefore, they contend, 89.45989 percent of the distributions to Quirk are to be treated as guaranteed payments since the amounts were determined without regard to the income of the partnership. As guaranteed payments, they are ordinary income to Quirk and deductible by the partnership under section 162 by virtue of section 707(c). The balance of each distribution or 10.5401 percent is a nontaxable return of basis to Quirk to the extent of his basis and not deductible by the remaining partners. Finally, they contend that the overall distributions to Quirk include the $ 184,002 release of liability of the Chemical Bank note pursuant to sections 752 and 736. Quirk, on the other hand, disputes this analysis, and characterizes the distributions to him by the partnership as payments in exchange for his partnership interest under section 736(b)(1). Quirk maintains that with respect to each disputed item of the state lawsuit there was a reasonable prospect that the asset valuation could be changed. Those areas included the value off Quirk's overall *335 partnership interest, the method by which QLM computed and valued accounts receivable, doubtful accounts, and the omission from the QLM financial statement of computer tapes and programs. That being the case, distributions might very well be deemed as made for assets other than unrealized receivables, and, if the payments are not for partnership unrealized receivables, then the amounts paid are treated as made for the partner's interest in assets and as a distribution under section 731. [13]
We find for respondent and the remaining partners on these issues despite Quirk's arguments. Quirk provided no evidence to support his contentions that the distributions made to him for his interest in the partnership represented for the most part partnership assets other than unrealized receivables, and for purposes of this analysis, we will adopt the amounts and figures in the Peat Marwick statements. [14] To the extent the payments were made for unrealized receivables, 89.45989 percent, Quirk must take the *336 payments into income as guaranteed payments [15] because the payments to him were made according to percentage interest in the assets of the partnership. Moreover, as the $ 184,002 decrease in Quirk's individual liability on the Chemical Bank note is considered as a distribution of cash to him by the partnership under section 752(b), and 89.45989 percent of that distribution is accordingly treated as attributable to unrealized receivables, this amount must also be found to be a guaranteed payment. Having determined the nature of the payments, we must now determine the proper allocation of the distributions and whether or not the distributions received by Quirk were fixed or contingent within the meaning of the regulations and section 736, to decide their proper tax treatment. As previously stated, section 1.736-1(a)(2), Income Tax Regs., provides that when a partnership makes payments to retire a withdrawing partner's entire interest, the payments must be allocated *337 between payments under section 736(a) and payments under section 736(b). Payments made to a retiring partner for the value of his interest in partnership property other than unrealized receivables are classified as "section 736(b) payments," whereas payments to the retiring partner for unrealized receivables are classified as "section 736(a) payments." Section 1.736-1(a)(2) and 1(b), Income Tax Regs. Depending upon the circumstances, payments for goodwill may be section 736(a) or section 736(b) payments. The regulations, after requiring the above allocation, which was determined to be 89.45989 percent/10.5401 percent, based on the Peat Marwick financial statement, discuss how the allocation should be made when the amount to be paid to the retiring partner (1) is a fixed amount and (2) is not a fixed amount. [16]
*338 Payments which are fixed in amount - The discussion in the regulations regarding the payment of a fixed amount assumes that the fixed amount will be paid over a specific period of time and provides that if the fixed amount (whether or not supplemented by any additional amounts) is to be received over a fixed number of years, a portion of each payment is treated as a distribution in exchange for partnership property under section 736(b). The portion of each payment so treated is equal to the ratio of the total fixed agreed payments under section 736(b) to the total fixed agreed payments under sections 736(a) and (b). The balance of each payment is treated as a payment under section 736(a)(1) or (2). Section 1.736-1(b)(5)(i), Income Tax Regs.
Payments which are not fixed in amount - When the retiring partner receives payments which are not fixed in amount, "such payments shall first be treated as payments in exchange for his interest in partnership property *339 under section 736(b) to the extent of the value of that interest and, thereafter, as payments under section 736(a)." Section 1.736-1(b)(5)(ii), Income Tax Regs. Payments which are not fixed in amount are payments such as those based on a percentage of partnership income earned over a period of future years. Section 1.736-1(b)(7), Income Tax Regs.
It is respondent's and the remaining partner's position that the determination of the character of each distribution to Quirk (of cash, or of a release of liability under section 752) is to be determined pursuant to section 1.736-1(b)(5)(i), Income Tax Regs., because the payments are of a fixed amount. They contend that while there is a dispute over the value of the assets, there is no dispute that Quirk is entitled to his percentage of the partnership assets as of October 31, 1974. It is submitted that Quirk's share of these assets represents a fixed amount as that term is used in the regulations, and the fact that Quirk could received more as a result of the litigation would merely represent the "supplemental" amounts contemplated by the regulations. *340 Petitioner Quirk argues to the contrary. He contends these distributions can not be characterized as fixed amounts because they were contingent pursuant to section 1.736-1(b)(5)(ii), Income Tax Regs., and that any payments to him in 1974 and 1975 must be treated as payments under section 736(b)(1) to the extent of his partnership basis, and that no part of the payments would be treated as attributable to unrealized receivables until Quirk had received payment for his interest in partnership property. Quirk provides two reasons for classifying his distribution payments as contingent and, therefore, as payments for his interest in partnership property under section 736(b)(1). First, Quirk argues that the regulations describe the requisite fixed amount in conjunction with its receipt over a fixed number of years because the language explicitly requires both the existence of a fixed sum and a certain pay out period before a fixed sum can qualify as a payment to which the allocation ratio should be applied. In the present case, he points out that even if it might be said that a fixed amount is present, there are no facts from which it can be determined the *341 period of time payments were to be made. Moreover, Quirk cites our decision in Milliken v. Commissioner,72 T.C. 256 (1979), affd. in an unpublished opinion (1st Cir. 1979), as support for this position, which he interprets as implying that a fixed amount will be present only where it is relatively certain and defined how much and over what period of time payments will be made. The second reason why Quirk believes that the distribution payments should be treated as made pursuant to section 736(b)(1) is that the language of the regulations requires the existence of an agreement between the parties with respect to the total of the fixed payments, which he reads as stemming from the phrase "total fixed agreed payments" in section 1.736-1(b)(5)(i), Income Tax Regs. In this case, he continues, the parties have not agreed in any respect on the issue of the totality of the payments Quirk will receive. Furthermore, it is incorrect to suggest that because minimum total payments, pursuant to the Peat Marwick financial statement, may eventually be paid to Quirk, the regulatory requirements needed to establish the existence of fixed payments have *342 been met. The regulation does not specify or call for the existence of such a minimum amount. Once again, we cannot agree with Quirk's interpretation of the regulations or the case law, and find that the distribution payments to Quirk in the instant case were of a "fixed amount." First, we do not read the regulations as necessarily requiring payments of a fixed amount and over a fixed period of time. The legislative history of section 736 illustrates this point: Section 736. Payments to a retiring partner or a deceased partner's successor in interest. This section provides rules for the treatment of payments made to a retiring partner or to the estate, heir, or any other successor in interest of a deceased partner. The provisions are applicable only if the payments are in exchange for the liquidation of the partnership interest of the recipient. It is immaterial whether such payments are based on a percentage of partnership income, or are fixed in amount and payable either in a lump sum or periodically over an interval of time.[17] [Emphasis added.] *343 If we were to adopt petitioner's interpretation, a lump-sum payment could never be deemed a "fixed amount" because by its terms it would not be payable over a fixed period. A lump-sum payment could not, therefore, ever be allocated between section 736(a) and 736(b) payments. This is in contradiction to the legislative history, and clearly not what the regulations intended. Moreover, in section 1.736-1(b)(5)(ii), Income Tax Regs., which discusses contingent payments, contingent payments are described as not fixed in amount. There is no mention of the "not received over a fixed number of years" aspect, the emphasis of Quirk's argument. The regulations and the legislative history highlight the fixed "amount" and not the fixed number of payments. We further do not read the case of Milliken v. Commissioner, supra, as supporting a finding that a fixed amount will only be present where there is relatively defined amount and payment schedule. Rather, Milliken focuses on whether payments were not fixed in amount because of certain undetermined set-offs against the payments due the taxpayer. While the payments in Milliken were payable *344 over a fixed period of time, the Court in Milliken did not base its decision on this aspect of the regulations, and as respondent points out, did not qualify its application of section 1.736-1(b)(5)(i), Income Tax Regs., to such a situation. Second, nowhere in the regulations is an agreement required between the parties with respect to a set number of payments in order to have a "fixed amount." Section 1.736-1(b)(5)(iii), Income Tax Regs., specifically states that: In lieu of the rules provided in subdivisions (i) and (ii) of this subparagraph, the allocation of each annual payment between section 736(a) and (b) may be made in any manner to which all the remaining partners and the withdrawing partner * * * agree. [18]
Thus, in the absence of an agreement, subdivisions (i) and (ii) apply. Finally, Quirk makes the argument that the possibility he might receive an amount in excess of the Peat Marwick valuation of his share of the partnership assets means that all distributions made to him *345 must be treated as contingent payments and not as a fixed amount. We do not agree with this contention. Any excess would be an additional amount within the meaning of section 1.736-1(b)(5)(i), Income Tax Regs., and would not disrupt his entitlement to 30.667 percent of the partnership assets. To interpret otherwise would allow any withdrawing partner to have the ability to create contingent payments merely by initiating litigation, thereby circumventing the regulations and allocation sanctioned therein. Moreover, this specified minimum amount based on a fixed percentage of partnership assets is due Quirk without regard to partnership income and would satisfy the definition of fixed amount pursuant to the section 736 regulations. Because we find a fixed amount is due Quirk, the applicable regulation is section 1.736-1(b)(5)(i), Income Tax Regs., and Quirk's payments must be allocated according to its provisions. Thus, the payments must be allocated between unrealized receivables and other assets. Of each payment received, 89.45989 percent is to be treated as guaranteed payments and reportable as ordinary income to Quirk and *346 deductible by the partnership. The balance, or 10.5401 percent of each distribution, is a recovery of basis and then capital gain. The total payments to Quirk after October 31, 1974, in liquidation of his partnership interest amounted to $ 151,945 [19] in 1974 and $ 207,372 [20] in 1975, and 89.45989 percent of each payment represented a guaranteed payment deductible by the partnership in 1974 to the extent of $ 135,929.83 ($ 151,945 x 89.45989 percent) and $ 185,514.76 in 1975 ($ 207,372 x 89.45989 percent). The balance of the distributions, $ 16,015 in 1974 ($ 151,945 x 10.5401 percent) in 1974 and $ 21,857 in 1975 ($ 207,372 x 10.5401 percent) are to be applied against Quirk's adjusted basis of his interest in the partnership under sections 736(b) and 731(a)(1). [21] Quirk must report capital gain only to the extent his distributions exceed his adjusted basis in the partnership. Section 736(b). *347 Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Thomas P. and Mary C. Quirk, docket No. 28148-82; Estate of Thomas P. Quirk, docket No. 28149-82; John P. and Eileen F. Lawler, docket No. 28681-82; Michael J. and Georgette T. Skelly, docket No. 28682-82; Karim A. and Donna H. Abood, docket No. 28683-82; Felix E. and Florence P. Matusky, docket No. 28710-82. ↩
2. Respondent determined the following deficiencies in these cases which have been consolidated for purposes of trial, briefing and opinion: Petitioner(s)*
Docket No.
Year(s)
Amount(s)
Estate of Thomas
28148-82
1974 **$ 250,101
and Mary Quirk
Estate of Thomas Quirk
28149-82
1975
$  97,274
John and Eileen Lawler
28681-82
1974
$  26,000
1975
$  33,060
Michael and
28682-82
1974
$   7,570
Georgette Skelly
1975
$  26,244
Karim and Donna Abood
28683-82
1975
$   6,990
Felix and
28710-82
1975
$  25,081
Florence Matusky
1975
$  26,030
* Middle initials omitted.
** The deficiency for 1974 as to Estate of Thomas P. Quirk and Mary Quirk was increased by respondent's amendment to answer filed on November 5, 1985. ↩
3. Because of concessions, the deficiency determined in the amended answer was further reduced and Rule 155 computations will be required. ↩
4. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
5. On January 1, 1973, Skelly was admitted as a partner to QLM. ↩
6. The suit is entitled Quirk v. Lawler, Matusky and Skelly,↩ both individually and as partners of Lawler, Matusky and Skelley, Index No. 3841/77. The remaining partners denied Quirk's allegations in the court action. 7. See Champlin v. Commissioner,T. C. Memo. 1977-196, affd. in an unpublished opinion 633 F.2d 221↩ (9th Cir. 1980). 8. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) PAYMENTS CONSIDERED AS DISTRIBUTIVE SHARE OR GUARANTEED PAYMENT. -- Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection(b), be considered -- (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income off the partnership. (b) PAYMENTS FOR INTEREST IN PARTNERSHIP. -- (1) GENERAL RULE. -- Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection(a). (2) SPECIAL RULES. -- For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for -- (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will. ↩
9. A partner retires when he ceases to be a partner under local law. See section 1.736-1(a)(1)(ii), Income Tax Regs.↩ As of October 31, 1974, Quirk ceased to be a partner of QLM under New York State law. 10. Had the remaining partners reached a withdrawal agreement with Quirk which allocated the distributions between unrealized receivables and other assets, such an agreement would have been respected subject to stated limitations. See section 1.736-1(b)(5)(iii), Income Tax Regs. See note 15, infra. Absent such an agreement, a section 736 allocation applies. See Lynch v. Commissioner,T. C. Memo. 1982-305. Therefore, the general rules of section 736↩ apply on this set of facts. 11. Section 752(b) provides: DECREASE IN PARTNER'S LIABILITIES. -- Any decrease in a partner's share of the liabilities of the partnership, or any decrease in a partner's individual liabilities by reasons of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership. ↩
12. Section 707(c) provides: GUARANTEED PAYMENTS. -- To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a)↩ (relating to trade of business expenses). 13. If this were the case, Quirk would not recognize any gain except to the extent any distributions exceed the adjusted basis of his partnership interest. See section 731(a)(1)↩. 14. The outcome of the New York State Court proceeding may change these numbers. However, there is nothing in the record regarding such outcome. ↩
15. See sections 736, 707(c), 751(c)↩. 16. Section 1.736-1(b)(5)(i)-(iii), Income Tax Regs., reads: (5) Where payments made under section 736 are received during the taxable year, the recipient must segregate that portion of each such payment which is determined to be in exchange for the partner's interest in partnership property and treated as a distribution under section 736(b) from that portion treated as a distributive share or guaranteed payment under section 736(a). Such allocation shall be made as follows -- (i) If a fixed amount (whether or not supplemented by any additional amounts) is to be received over a fixed number of years, the portion of each payment to be treated as a distribution under section 736(b) for the taxable year shall bear the same ratio to the total fixed agreed payments for such year (as distinguished from the amount actually received) as the total fixed agreed payments under section 736(b) bear to the total fixed agreed payments under sections 736(a) and (b). The balance, if any, of such amount received in the same taxable year shall be treated as a distributive share or a guaranteed payment under section 736(a)(1) or (2). * * * (ii) If the retiring partner or deceased partner's successor in interest receives payments which are not fixed in amount, such payments shall first be treated as payments in exchange for his interest in partnership property under section 736(b) to the extent of the value of that interest and, thereafter, as payments under section 736(a). (iii) In lieu of the rules provided in subdivisions (i) and (ii) of this subparagraph, the allocation of each annual payment between section 736(a) and (b) may be made in any manner to which all the remaining partners and the withdrawing partner or his successor in interest agree, provided that the total amount allocated to property under section 736(b)↩ does not exceed the fair market value of such property at the date of death or retirement. 17. See H. Rept. No. 1337, 83d Cong., 2d Sess. (1954). See also S. Rept. No. 1622, 83d cong., 2d Sess. (1954) (This report also speaks of both lump sum and fixed payments.) ↩
18. See note 16, supra.↩
19. This is comprised of:
$ 15,975 cash
120,636 release of liabilities other than Chemical Bank
note
15,334 release of Chemical Bank note
$ 151,945 ↩
20. This is comprised of:
$ 23,370 cash
184,000 release of Chemical Bank notes
$ 207,372 ↩
21. Because we have found for respondent and the remaining partners on the issue of the amount of the section 736(a) distributions, Quirk will have no capital gain to report in 1974 or 1975. Neither Quirk, the remaining partners, nor respondent assert that his adjusted basis was less than $ 37,872 at the time Quirk withdrew ($ 16,015 plus $ 21,857). Any future payments to Quirk with respect to the value of his interest in QLM (whether the amount is $ 232,795 per the Peat Marwick statement or a different amount per the outcome of the New York State Court proceeding) should be reported using the same allocation, as amended, if required by the New York State Court proceeding. ↩